[No. B079357. Second Dist., Div. Two. Apr. 30, 1996.]

SHELL OIL COMPANY, Plaintiff and Appellant, v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

## COUNSEL

Randall J. Heldt, Brobeck, Phleger & Harrison, John J. Wasilczyk and Michael B. Green for Plaintiff and Appellant.

Lynberg & Watkins and Judith Gold for Defendant and Appellant.

## OPINION

**FUKUTO, J.**—Defendant National Union Fire Insurance Company of Pittsburgh, Pa. (National) appeals from a judgment after court trial, awarding plaintiff Shell Oil Company (Shell) damages for breach of a liability insurance policy. National raises numerous issues, the primary ones being whether National provided coverage for an accident that resulted from Shell's sole negligence, and if so whether National yet fulfilled its contractual duties by paying its policy limit in settlement for a coinsured. Shell cross-appeals from the judgment insofar as it did not award attorney fees for this action, which Shell claimed under Washington state law. We affirm the judgment in all respects.

### I. STATEMENT

In September 1985, Shell entered into "Contract 169" (the contract) with S.I.P. Engineering, Inc. (S.I.P.), for performance of engineering work on Shell's oil refinery in Anacortes, Washington. Paragraph 6.2 of the contract obligated S.I.P. to defend and indemnify Shell, up to $5 million, for any claims, liabilities or expenses on account of personal injury or property loss arising out of S.I.P.'s or its subcontractors' work, "but excepting when the injury . . . or damage is caused by the sole negligence of a party otherwise indemnified [i.e., Shell]."

Paragraph 7.1 of the contract provided that during its term S.I.P. would maintain specified insurance, "satisfactory to Shell," including workers'

compensation (¶ 7.1(a)), employers' liability (¶ 7.1(b)), auto liability (¶ 7.1(c)), and, under paragraph 7.1(d), "Comprehensive General Liability Insurance, including product/completed operations coverage and contractual liability coverage for [S.I.P.'s] obligations hereunder to defend and/or indemnify Shell, with limit of $1,000,000 each occurrence for bodily/personal injury, death and property damage combined." Finally, as here relevant, paragraph 7.2 of the contract provided that "To the fullest extent permitted by law, all insurance policies maintained by [S.I.P.] in accordance with paragraph 7.1 above and any other insurance maintained applicable to [S.I.P.'s] performance hereunder shall include Shell and any parties in joint operation with Shell as additional insureds . . . ."

In fulfillment of its insurance obligations under paragraphs 7.1 and 7.2, S.I.P. provided, inter alia, a $1 million comprehensive general liability policy from National (the policy). In its definitions of whom it insured, the policy provided that "if specifically required to be included as a named insured, this policy shall include as a named insured any person or organization to whom the named insured [i.e., S.I.P.] is obligated by virtue of a contract, entered into before loss, to provide insurance such as is afforded by this policy, but only to the extent required by said contract and not to exceed the coverages and the limits of liability afforded by this policy." Three other insurance companies—Lexington, Pacific Employers, and Granite State (the excess insurers)—provided insurance over National's to a limit of $5 million. The excess policies covered the same persons as did National's.

On January 29, 1986, Donald Vaughn, an employee of one of S.I.P.'s subcontractors, suffered severe injuries from a high-voltage electrical circuit while performing work at Shell's refinery in connection with the contract. S.I.P. reported the accident to National. On May 16, 1986, Vaughn sued S.I.P. and Shell for negligence in federal court in Seattle. Shell also was sued, in subrogation, by the subcontractor's workers' compensation carrier. S.I.P. tendered its own defense to National, which accepted and agreed to pay the lawyers S.I.P. had retained.

Shell did not immediately tender its defense, instead defending through in-house and retained counsel. After Shell obtained National's and the excess insurers' policies in September 1987, it sought coverage through S.I.P.'s counsel. Not having received confirmation, Shell formally demanded coverage and defense (including payment of expenses already incurred) from National and the excess insurers on January 21, 1988.

By that time, National had resolved to offer its policy limits, on behalf of S.I.P. On March 22, 1988, the Vaughn case proceeded to a judicially

required mediation, and was settled. National and its excess insurers—which had declined to cover Shell—paid S.I.P.'s share of the settlement: $2 million, comprising National's $1 million policy limit and another $1 million from the excess insurers. Shell paid another $2 million, and also waived a $225,000 workers' compensation lien which it had acquired in settlement with the compensation carrier.

Further litigation among the parties followed in Washington. Shell had sought indemnity from S.I.P., under the contract, but S.I.P. prevailed, the court finding that the Vaughn accident had been caused by Shell's sole negligence. Thereafter, S.I.P., National and the excess carriers filed two "contribution" actions against Shell, to recover what they had paid to Vaughn. Shell prevailed in those actions because the releases given to Vaughn had not preserved such claims.

Shell pursued its own claim for coverage and defense against National and the excess insurers in two actions, the present one and a companion case in Los Angeles federal court, which ultimately was dismissed on procedural grounds. Shell's third amended complaint in the present case sought a declaratory judgment of entitlement to the sums Shell had paid in settlement and defense of the Washington cases, including attorney fees and costs incurred in them and in this case. Alternatively, in the event it was determined not to have been covered, Shell prayed for the same relief from S.I.P., on account of breach of the contract to insure.

On motion for summary adjudication, the court ruled that Shell had been covered for defense and indemnification in the Vaughn action, by reason of the contract and National's and the excess insurers' policies. The excess insurers then settled with Shell for $950,000. The matter proceeded to trial against National.

The court determined that Shell was entitled to $500,000 from National, half of its policy limit, with prejudgment interest from the date National had paid the Vaughn case settlement for S.I.P., amounting to $265,972. Shell also was awarded $280,231 in attorney fees and costs incurred in the Vaughn case and in S.I.P.'s and the insurers' suits for contribution. (This amount was determined before a referee.) However, Shell's prayer for attorney fees for this action was denied.

## II. NATIONAL'S APPEAL

The basis for the judgment below is straightforward: under the contract and National's policy, National was obligated to defend and indemnify Shell

in Vaughn's case and the contribution litigation arising out of it; accordingly, Shell was entitled to damages from National for Shell's expenses of defending those cases and for one-half of the policy limits payment that National made but apportioned all to its coinsured, S.I.P. National disputes these premises, and the judgment, with the following contentions. First, the Vaughn litigation was not within National's coverage because it involved Shell's sole negligence, for which neither indemnification nor insurance coverage was required under the contract; second, National in any event fully discharged its duty to indemnify Shell when it paid its policy limits in settlement; third, National's duty to defend Shell, if any, was limited to the three-month period between Shell's formal tender of defense and National's settlement payment in the Vaughn case; finally, Shell was not entitled to prejudgment interest, and National's liability should have been reduced by the amount the excess insurers paid Shell in settling this case.

Before resolving National's contentions, we note that the contract contained the following choice of law provision: "This Contract shall be construed and the rights of Shell and [S.I.P.] shall be determined (with respect to both interpretation of this Contract and its performance) according to the laws of the state in which the Work Site is located." Both parties agree that the law thus applicable to such questions is that of Washington. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 44-45, pp. 82-86.) However, the briefs and our own review disclose few, if any, differences between Washington's law and California's with respect to National's affected issues.[1] Indeed, National relies at least as much upon California case law as upon Washington's. We thus apply Washington law where required, but without expounding or citing it generally.

1. *The Question of Coverage.*

█ Whether Shell was covered by National for the Vaughn case and the related subrogation and contribution claims involves determining the meaning of provisions of the contract and National's policy that have been set forth above. The trial court decided this question as a matter of law. There being no conflicting extrinsic evidence, the parties do not dispute that this court should do the same. The key issue is whether coverage extended to claims arising out of Shell's sole negligence, a condition that Shell does not dispute appertained in Vaughn's case.

Paragraph 6.2 of the contract provided for indemnity of Shell by S.I.P. Although generally omnibus, it specifically excluded claims or liabilities for

---

[1]The two jurisdictions do differ substantially on the law underlying Shell's cross-appeal.

injury caused by Shell's sole negligence. As National points out, in this construction contract a contrary provision, undertaking indemnity for sole negligence, would have been void. (Wash. Rev. Code § 4.24.115; accord, Civ. Code, § 2782, subd. (a).)

Paragraph 6.2, however, concerned indemnity by S.I.P., not the scope of the insurance Shell was to be (and was) provided under the contract. That subject was dealt with in paragraphs 7.1 and 7.2 of the contract, which required S.I.P. to maintain a variety of insurance, including comprehensive general liability, and to include Shell as an insured in all such policies. National fundamentally contends that these provisions excluded insurance for Shell's sole negligence, because they incorporated the limits of S.I.P.'s indemnity obligation.

We examine first paragraph 7.1(d) of the contract, under which National's policy was required and maintained. Paragraph 7.1(d) required S.I.P. to carry "Comprehensive General Liability Insurance [hereafter CGL], including product/completed operations coverage and contractual liability coverage *for Contractors' obligations hereunder to defend and/or indemnify Shell*, with limit of $1,000,000 each occurrence . . . ." (Italics added.) National contends that the italicized language did not simply modify "contractual liability coverage," but rather applied to and defined "Comprehensive General Liability Insurance" as a whole, with the result that S.I.P. was to maintain CGL only for S.I.P.'s indemnity obligations, and thus not for liabilities occasioned by Shell's sole negligence. Shell, on the other hand, contends that the italicized language modified a particular subspecies of CGL, namely contractual liability coverage, and thus the CGL required by the contract was otherwise not limited to S.I.P.'s indemnity obligations.

From several vantage points, Shell's interpretation is the reasonable one and National's is unreasonable. Textually, paragraph 7.1(d) first requires CGL, without limitation. There follows a parenthetical, modifying phrase, set off by commas, that begins with the illustrative word "including," and in turn contains the italicized "indemnity" language. Moreover, that language immediately follows and is attached to, without intervening punctuation, "contractual liability coverage," which is the particular type of liability insurance that would cover liabilities assumed by contract (e.g., an agreement to indemnify). (See *Alex Robertson Co.* v. *Imperial Casualty & Indemnity Co.* (1992) 8 Cal.App.4th 338, 343 [10 Cal.Rptr.2d 165]; *Loyola Marymount University* v. *Hartford Accident & Indemnity Co.* (1990) 219 Cal.App.3d 1217, 1225-1226 [271 Cal.Rptr. 528].) Thus, it appears both

syntactically and substantively appropriate to read the italicized language as relating to and modifying that coverage, rather than CGL as a whole.[2]

On the other hand, National's propounded construction of the italicized indemnity language, as embracing and limiting all of the CGL required by paragraph 7.1(d), poses several anomalies. First, had that been the intent of the parties, the italicized language more naturally would have appeared immediately after "Comprehensive General Liability Insurance," rather than in the parenthetical phrase following it. Moreover, CGL does not normally cover indemnity obligations; that is the office of the special contractual liability coverage endorsement. (See 3 Cal. Insurance Law & Practice (1996) §§ 41.22[7][c], pp. 41-48, 49.31[1], pp. 49-61 to 49-62.) And similarly, the other special coverage called for by paragraph 7.1(d)—"product/completed operations coverage"—provides coverage for injuries from products, construction, and services after their completion (*id.*, §§ 47.04 to 47.05, pp. 47-10 to 47-21), not for the insured's obligations to indemnify another. Yet National insists that the contract meant to provide for this coverage too solely for S.I.P.'s indemnity obligations.

National's construction of paragraph 7.1(d) as limiting CGL to coverage for S.I.P.'s indemnity obligation also does not make sense in the larger context of the contract. Paragraph 7.1 as a whole required S.I.P. to maintain a varied package of insurance (workers' compensation, employers' liability, automobile, and CGL), covering the general range of risks S.I.P. could encounter in performing the contract. The apparent purpose of this requirement extended beyond insuring S.I.P.'s indemnity obligation, to providing S.I.P.—as well as Shell, under paragraph 7.2 (discussed below)—protection from out-of-pocket liability and dislocation. To construe paragraph 7.1(d) to limit the broad CGL coverage to insuring "Contractors' obligations hereunder to defend and/or indemnify" would slight both S.I.P.'s and Shell's business interests. Moreover, insofar as Shell was to be a direct beneficiary of the contract's insurance requirements, restricting the CGL to indemnifiable claims, and thus excluding from it those involving Shell's sole negligence, would have left Shell unprotected for those claims for which it most needed insurance. (Accord, *Chevron U.S.A., Inc.* v. *Bragg Crane & Rigging Co.* (1986) 180 Cal.App.3d 639, 644 [225 Cal.Rptr. 742] (*Chevron*).)

National further contends that its interpretation of paragraph 7.1(d), and the consequent lack of coverage for Shell's sole negligence, are confirmed

---

[2]So construing the italicized language does not render it redundant, as National contends. Contractual liability coverage may or may not be restricted to particular obligations. (See 219 Cal.App.3d at pp. 1226-1227.)

by paragraph 7.2 of the contract, which required Shell's inclusion as an additional insured in S.I.P.'s insurance policies (or alternatively a "waiver of subrogation," which was not given). That requirement applied to "all insurance policies maintained by [S.I.P.] in accordance with paragraph 7.1 above and any other insurance maintained *applicable to* [*S.I.P.'s*] performance hereunder . . . ." (Italics added.) The reference to paragraph 7.1 of course begs the issue of paragraph 7.1(d)'s meaning. But National appears to argue that the language italicized above limited the insurance to "S.I.P.'s performance" of its indemnity obligations. We do not so read it. Like the rest of paragraphs 7.1 and 7.2, this language plainly appears to refer to S.I.P.'s performance of the contract as a whole. Once again, there is no textual or practical reason to perceive the broad, plain language of these insurance provisions of the contract as requiring coverage only for S.I.P.'s indemnity obligations.

National contends, however, that there are legal reasons requiring such construction. First, National notes that in both Washington and California, agreements purporting to indemnify for sole negligence must be explicit, and are strictly construed against the indemnitee. (*Jones* v. *Strom Construction Co., Inc.* (1974) 84 Wn.2d 518 [527 P.2d 1115]; 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 101, pp. 176-178.) But this doctrine in terms does not apply here, because the obligation to be construed is not an indemnity clause (such as paragraph 6.2 of the contract) but rather an agreement to provide and carry insurance. Insurance, of course, is commonly provided to protect from liability for solitary negligence. (See *Chevron*, *supra*, 180 Cal.App.3d at p. 644, fn. 4; cf. Civ. Code, § 2782, subd. (a) [excluding insurance contracts from the prohibition against indemnity for sole negligence in construction contracts].) "Here [Shell] did not contract to exculpate itself from liability. Rather, it contracted for the procurement of insurance. [National]'s contention is therefore unpersuasive." (*Chevron*, *supra*, 180 Cal.App.3d at p. 647, fn. omitted; see *id.* at p. 648, fn. 13.)

National therefore argues at great length that an agreement to procure insurance for the promisee's sole negligence should either be against public policy, or at least subject to strict construction. But National admits that no Washington decision has so held. And neither the foreign decisions that National advances, nor Washington Revised Code section 4.24.115, which invalidates construction contract indemnity agreements for the indemnitee's own negligence, convinces us that Washington either outlaws or imposes a rule of strict construction upon insurance policies or insurance procurement

contracts. We therefore perceive no mandate to depart from a plain and natural construction of paragraphs 7.1(d) and 7.2.[3]

National finally contends that Shell's own conduct in the Vaughn case evidenced that the contract did not provide for insurance covering Shell with respect to that case. Specifically, Shell undertook its own defense from the outset, and did not ask S.I.P. for insurance policy information or coverage for over a year, until S.I.P. had produced its policies to Vaughn in belated response to his discovery. At trial below, Shell explained that its counsel and S.I.P.'s had agreed not to undertake discovery from each other; but, National urges, that did not explain Shell's failure to seek the policy informally from its codefendant and obligor.

Shell's behavior does appear somewhat curious, but its very opaqueness fails to confirm or establish the construction of the contract that National propounds. At bottom, National contends that Shell refrained from seeking the policy, and then tendering the Vaughn case, out of an absolute conviction that it had been solely negligent and hence was not entitled to coverage by the terms of the contract. But such an attitude on the part of a party that was litigating the sole negligence question—and indeed would do so up to the decision in favor of S.I.P. after the settlement with Vaughn—is even more improbable than Shell's actual conduct. Even if unaggressive, Shell's performance does not convince us that the contract necessarily meant what National hypothesizes Shell once believed it did.

We conclude that paragraphs 7.1 and 7.2 of the contract required S.I.P. to provide insurance coverage for Shell, including its sole negligence. Those provisions therefore rendered Shell an insured under National's policy for the Vaughn case.

### 2. *National's Settlement Payment: Full Performance or Breach of Duty?*

■ Under its policy, National was separately obligated to both Shell and S.I.P., but only to an indemnity limit of $1 million for both. The policy provided that "the insurance afforded by this policy applies separately to each insured against whom claim is made or suit is brought, except with respect to the limit of liability." National contends that it fully performed its obligation to Shell by paying the policy limit, to fund S.I.P.'s settlement with Vaughn, while leaving Shell to pay its own settlement out-of-pocket. (Of course, in so paying while denying that Shell was covered, National positioned itself to seek to recover the payment from Shell.) The trial court

---

[3]Indeed, we doubt that a "strict" construction would yield a different result.

rejected this contention. It held that National had not been entitled to pick and choose between its two insureds in its payment of benefits, "particularly where no detriment is demonstrated by providing equal treatment to both insureds." We agree.[4]

It is undisputed that National allocated and applied all of the $1 million cash benefit of its policy to S.I.P.'s liability to Vaughn, and none of it to Shell's. National yet contends that the payment for S.I.P.'s liability afforded the full $1 million benefit to Shell as well, because Vaughn's release of S.I.P. reduced his claim against cotortfeasor Shell by the amount of National's payment for S.I.P., under Washington's release statute. (Wash. Rev. Code, § 4.22.060; accord, Code Civ. Proc., § 877, subd. (a).) This contention is illusory.

Shell received no statutory credit from S.I.P.'s settlement, because that settlement was simultaneous with, and dependent upon, Shell's own $2 million settlement with Vaughn. With both defendants settling simultaneously, there remained nothing against which Shell could "offset" National's payment. That payment only could have operated to reduce Vaughn's "claim" against Shell (Wash. Rev. Code § 4.22.060; accord, Code Civ. Proc., § 877, subd. (a)), had it remained pending (and ultimately produced a judgment).

Nor do the cases on which National relies support the premise that payment of policy limits on behalf of one coinsured necessarily satisfies the insurer's obligation to the other coinsured. In *Nationwide Ins. Co. v. Hunley* (9th Cir. 1990) 915 F.2d 557 (*Nationwide*), the issue was whether the carrier had fulfilled its statutory obligation to afford a permissive user insurance "to the same extent that insurance is afforded to the named insured." (Ins. Code, § 11580.1, subd. (b)(4).) The insurer had offered its $25,000 limit on behalf of both parties, but after rejection had paid the entirety on behalf of the policyholder, leaving the permissive user to fend for himself. The court held that the $25,000 statutory credit to a judgment against the user (Code Civ. Proc., § 877, subd. (a)) signified that both parties had been equally insured. However, the court continued, absent that statutory allowance, "Nationwide could not have made [its] payment on [the policyholder's] behalf without violating its statutory obligation to insure [the user] to the same extent that it insured [the policyholder]. *In that case, Nationwide would have depleted the limited fund to which [the user] could look for indemnity without providing any benefit to [him] in the process. Such an action, if done on [either's]*

---

[4]We reject Shell's argument that National waived this contention by failing to plead it sufficiently in its answer.

*behalf, would have violated Nationwide's contractual duty to [the other]."* (*Nationwide, supra,* at p. 560, italics added.) Thus, on the facts of this case, *Nationwide* actually confirms the trial court's judgment.

*Hartford Casualty Ins. Co.* v. *Mid-Century Ins. Co.* (1994) 26 Cal.App.4th 1783 [32 Cal.Rptr.2d 351] (*Hartford*) is more favorable to National, but ultimately is not dispositive. In that case Mid-Century's primary policy had a $15,000 limit for an accident by a permissive user. Mid-Century paid that amount to settle the owner's liability, and refused to defend or indemnify the user and a codefendant employer, both of whom also were insureds. Hartford, whose policy provided excess coverage for those insureds, defended and settled for them for additional amounts, and then sought reimbursement from Mid-Century under equitable indemnity. The court held that Mid-Century had fulfilled its obligations under its policy. "Mid-Century promised only to defend and to pay $15,000 for a permissive user accident, regardless of the number of insured persons. That there happened to be three insured persons, rather than one, cannot expand the duty of the insurer. [Citation.] The primary insurer fulfilled its duty by defending and settling for $15,000 on behalf of its own named insured." (*Id.* at p. 1788.)

*Hartford's* analysis of the duties imposed by policy language may or may not be accurate. ▉ But further duties are imposed by the implied covenant of good faith and fair dealing that is also a part of every insurance policy (indeed every contract). And when there is more than one insured, "An insurer owes the duty of good faith and fair dealing to each of its insureds, and cannot favor the interests of one insured over the other." (*Lehto* v. *Allstate Ins. Co.* (1994) 31 Cal.App.4th 60, 72 [36 Cal.Rptr.2d 814].) ▉ Applying this rule, the court in *Lehto* reversed a judgment determining that an insurer had acted improperly when it refused to pay its policy limits for a release of only one insured, without a release of the coinsured. The court implicitly rejected the plaintiff's position that such a disposition would not have harmed the coinsured, because he "would get a [policy limits] credit against any damages awarded in plaintiff's case." (*Id.* at p. 66.) Rather, had the insurer accepted the plaintiff's offer, "it would have left one of its insureds bereft of coverage, an act of bad faith. [Citations]." (*Id.* at p. 75.) As do we, the *Lehto* court found *Hartford, supra,* inapposite, because it had not taken into account the duties of good faith, and also because in that case Mid-Century's settlement had not left the coinsureds without coverage, as Hartford provided it. (*Lehto, supra,* at p. 75, fn. 12.) (In contrast, in the Vaughn case National's refusal of coverage to Shell also stripped it—until this litigation—of coverage by the excess insurers.)

*Smoral* v. *Hanover Insurance Company* (1971) 37 A.D.2d 23 [322 N.Y.S.2d 12] reflects the same view. There once again, the insurer settled for policy limits on behalf of the owner, leaving the driver without coverage (except from his own carrier). The appellate court held the insurer liable, because "it was [the driver's] insurer and it owed a duty of good faith to him [citations]. Good faith in this connection means more than an absence of intent to harm. It means an adequate protection of the interests of the assured. [Citation.] While this duty has most frequently been considered where the interests of the company have been preferred to the detriment of the insured [citation], the same considerations would apply with equal force where the company preferred one of its insureds over another. It is absolutely no answer for the company to say that it paid the full amount of its policy if in so doing it fully protected one of its insureds and left the other completely exposed." (*Id.* at p. 25 [322 N.Y.S.2d at p. 14].) The court opined that the driver would be entitled to recover the proportion of the policy limits that in good faith should have been allotted to relieving or reducing his liability. (*Id.* at p. 26 [322 N.Y.S.2d at p. 14].)[5]

We thus agree with the trial court that National's disbursement of its entire policy limits to indemnify S.I.P. did not discharge National's policy obligations to Shell but rather constituted an actionable breach of those duties. The court's consequent award of damages equal to half the policy limits, conservative in view of Shell's sole negligence, is unexceptionable.

### 3. *Liability for Shell's Defense Expenses.*

National's policy included the standard obligation to defend any claim or suit against its insureds seeking damages within policy coverage. National never provided such a defense to Shell, and the trial court awarded Shell damages for the value of defense expenses it sustained, in the Vaughn case and in the subsequent contribution cases brought by S.I.P. and the excess insurers. National contests the propriety of these awards in various respects.

We summarily dismiss National's broad contention that Shell was entitled to no relief whatsoever, because it did not truly tender its defense to National but rather only demanded that National pay for lawyers Shell had selected. This contention appears only in a heading in National's reply brief: the text of that brief, and the opening brief, do not argue it. Moreover, Shell did

---

[5]The court did so over the dissent's protest that, "Being the active tort-feasor, Smoral's liability was reduced by the entire amount of the [policy limits] payment." (37 A.D.2d at p. 27 [322 N.Y.S.2d at p. 16].)

make a clear tender of defense, at least by January 1988. Indeed, it is the timing of that tender that grounds National's principal contention.

National contends that Shell was not entitled to recompense for its litigation expenses that preceded the January 1988 tender to National, by virtue of a provision in National's policy, under the heading "Assistance and Cooperation of the Insured," which provided in part: "The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for first aid to others at the time of the occurrence."

Whether this provision embraces expenses of defense is unclear. National cites no Washington authority on the question. Certain Ninth Circuit cases have intimated that the provision has been so construed and applied in California. (*Faust* v. *The Travelers* (9th Cir. 1995) 55 F.3d 471, 472, citing *Northern Ins. Co. of New York* v. *Allied Mut. Ins.* (9th Cir. 1992) 955 F.2d 1353, 1360.) But in fact, the only California case presenting the question pretermitted it, while "not[ing] the provision does not specifically refer to the costs of defense and there is a question what a reasonable insured would understand reading the provision." (*Fiorito* v. *Superior Court* (1990) 226 Cal.App.3d 433, 440, fn. 4 [277 Cal.Rptr. 27] (*Fiorito*).)[6] Of course, if the provision be deemed ambiguous in this regard, that ambiguity must be resolved against National. (E.g., *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

Even assuming the prohibition against voluntary payments unambiguously applied to expenses of defense before tender, the judgment allowing Shell reimbursement remains supported. *Fiorito, supra,* 226 Cal.App.3d 433, sustained the sufficiency of a cross-complaint by which two insureds sought to recover defense expenditures incurred during a four-month interval between service of summons and tender of defense. While their lawyer began to defend, the insureds had "searched for insurance policies that might provide coverage or defense." (*Id.* at p. 436.) They alleged they had been " 'compelled' to incur the pre-tender defense costs in order to respond to legal process and to protect their legal interests. They further allege[d] the obligations were not 'voluntarily' made as the term was used in" the policy language National here would invoke. (*Id.* at p. 438.) The court held that the voluntariness of those payments presented a triable issue, precluding demurrer. (*Id.* at p. 439.)

---

[6]*Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434 [91 Cal.Rptr. 6, 476 P.2d 406], cited in the Ninth Circuit decisions and by National, is not in point: the policy in that case distinctly provided that "The Assured shall not admit liability for or settle any claim or incur any costs or expenses in connection therewith without the written consent of the [insurers]." (*Id.* at p. 441.)

Under *Fiorito*, there are substantial difficulties with characterizing Shell's defense expenses as voluntarily paid. Until September 1987, Shell was unaware either of its insurer's identity, the contents of the policy, or both. And in the ensuing four months before formal tender, Shell sought without success to secure coverage and defense through S.I.P.'s counsel. We have observed that Shell's pursuit of its insurance coverage before it obtained the policy may have been less than aggressive. But without question, both the period of self-defense between September 1987 and January 1988, and at least a portion of the preceding period without knowledge, cannot be characterized as voluntary.

The trial court rejected National's voluntary payments argument at the close of trial. National raised it again before the special master appointed to determine Shell's defense expenses (a retired justice of this court), who dismissed it as without merit. The trial court approved the master's recommendations. Under these circumstances, it appears appropriate to treat the court's decision awarding Shell its expenses as an adjudication that the voluntary payments provision did not apply, either on its face or on the facts relating to voluntariness. Stated otherwise, the court's implicit determination that Shell's pre-tender defense expenses were not barred from recovery, because they were not voluntary, is supported by substantial evidence.[7]

National's policy also provided that National "shall not be obligated to pay any claim, judgment or award or to defend any suit or proceeding after the applicable limit of the company's liability has been exhausted by payment of judgments, settlements or awards." Based on this provision, National contends it could not be liable for Shell's defense expenditures after April 9, 1988, the date National paid its policy limits to Vaughn on behalf of S.I.P. We cannot agree.

National relies on our decision in *Johnson v. Continental Ins. Companies* (1988) 202 Cal.App.3d 477 [248 Cal.Rptr. 412] (*Johnson*). In *Johnson*, an insurer with a similar policy provision paid its policy limits to the accident claimants, at the insured's request. It then refused to defend the insured against indemnity-type cross-complaints in suits the insured and the claimants brought on account of the accident. Acknowledging "that California has yet to rule on the issue of whether an insurer must continue to defend claims that are proper under the substantive provisions of the policy after the

---

[7]This determination is in harmony with the court's specific finding that National was not prejudiced by Shell's settlement with Vaughn. That determination, made with regard to the same "cooperation" provision of the policy, reflects that Shell did not hamper National's rights or interests in conducting its defense.

monetary limits of the policy have been reached" (*id.* at pp. 483-484), we distinguished foreign decisions holding in favor of insureds. We noted that in two of those cases the insurer had tendered its policy limits in the course of litigation to avoid excess liability, in one case doing so without obtaining a release of the insured. (Cf. *Lehto* v. *Allstate Ins. Co.*, *supra*, 31 Cal.App.4th 60.) We concluded: "The cases cited by Johnson rely principally on the idea that an insurer, after being apprised of pending litigation against its insured, may not walk away from its duty to defend its insured by tendering its policy limits. As noted above, these cases are inapplicable to the instant facts since the insurer here tendered its policy limits in response to the demand of its insured prior to the initiation of litigation arising from the accident. [¶] We do not construe Continental's conduct as abandoning Johnson in midcourse or placing upon her shoulders the full burden of investigation, settlement, or defense." (*Johnson*, *supra*, at p. 486.)

The present case is everything *Johnson* was not. Here National afforded Shell none of the benefits of the policy. It left Shell holding the bag, as to both liability and defense. Although Shell had asked National to tender the policy limit, Shell had done so when demanding coverage for itself. Instead, National ignored its duties to Shell and paid its policy limit on behalf of S.I.P. only. In short, the April 9, 1988, payout marked not simply the monetary limit of National's indemnity undertaking but also the most material breach of its policy with Shell (for which most of the present judgment holds National responsible). National cannot truncate its responsibility and liability to Shell for defense by claiming it fully performed its coverage obligations by the very act of breaching them.

National finally contends that the award of approximately $70,000 for Shell's expenses of defending the contribution suits by S.I.P. and the excess carriers lacks legal or factual support. To the extent that National's arguments replicate those made above, they need not be addressed again.[8] As for the remaining issues, the contribution claims were within policy coverage: they were made "because of personal injury . . . caused by an occurrence," just as were the cross-claims in *Johnson*, *supra*, 202 Cal.App.3d 477. And National's assertion that substantial evidence did not establish the nature and existence of the excess insurers' suit is refuted by the very record National cites.

4. *Prejudgment Interest.*

■ The judgment awarded Shell prejudgment interest on its $500,000 damages for National's breach of coverage duties, running from April 9,

---

[8]For example, these payments cannot be deemed "voluntary" vis-à-vis National, which had repudiated any obligation to defend or indemnify Shell; indeed, Shell's alleged failure to tender the cases to National was excused by that repudiation.

1988, the date National paid all of its policy limits on behalf of S.I.P., not Shell. The statutory basis for this award was Civil Code section 3287, subdivision (a), which allows interest to "[e]very person who is entitled to recover damages certain, or capable of being made certain by calculation . . . ." National contends that Shell did not qualify under this standard, because it proposed three different measures of damages to the court, all of which were in dispute.[9]

The award was proper. "Generally, the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability." (*Olson* v. *Cory* (1983) 35 Cal.3d 390, 402 [197 Cal.Rptr. 843, 673 P.2d 720].) Here, Shell's alternative theories required only the court's legal determination of which was appropriate; the amount of damages would thereby be fixed. The present case thus resembles *Hartford Accident & Indemnity Co.* v. *Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285 [260 Cal.Rptr. 190], in which the overall responsibility of an insurer was in dispute, and the amount recoverable from it depended on how the court assigned priorities among it and two other insurers. There as here, "the amount of damages under either formula was readily ascertainable by mathematical calculation" (*id.* at p. 1307), and prejudgment interest was appropriate.

### 5. *Settlement Offset.*

■ Following the trial court's summary adjudication of coverage, the excess carriers settled this action with Shell for $950,000. National's final contention is that it should have been given an offset against its judgment liability for that amount, by virtue of Code of Civil Procedure section 877, subdivision (a). That section provides for reduction of remaining claims when a dismissal or release is given to one or more alleged cotortfeasors, or "to one or more other co-obligors mutually subject to contribution rights."

Code of Civil Procedure section 877 did not apply to this case, for several reasons. First, National and the excess insurers were not sued as tortfeasors; this case was based on breach of contract. Second, National and its excess insurers were not "other co-obligors": their obligations to Shell derived from

---

[9]Shell's theories were: (1) $2,225,000 (Shell's entire Vaughn case settlement), assuming National's policy limit were found not to have been pled; (2) $1 million (the policy limit), if the court found National should have indemnified only Shell and left S.I.P.'s payment to the excess carriers, who had accepted coverage for S.I.P. but had refused it to Shell; or (3) $500,000 (half the policy limit), assuming National owed equal obligations to its two insureds.

different policies, and extended to different monetary liabilities. (*Topa Ins. Co.* v. *Fireman's Fund Ins. Companies* (1995) 39 Cal.App.4th 1331, 1336-1338 [46 Cal.Rptr.2d 516]; *Hartford Accident & Indemnity Co.* v. *Superior Court* (1995) 37 Cal.App.4th 1174, 1181 [44 Cal.Rptr.2d 126]; *Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 29 Cal.App.4th 435, 440, fn. 4 [34 Cal.Rptr.2d 520].) Finally, the 1987 amendment to Code of Civil Procedure section 877, which extended its applicability to contractual obligors, also provided that the statute would not apply to a release or dismissal "given to a co-obligor on an alleged contract debt where the contract was made prior to January 1, 1988." (*Id.*, subd. (d).) All of the contracts involved in this case predated January 1, 1988. Shell's settlement with the excess carriers thus did not fall within section 877, and National was not entitled to an offset on account of that settlement.

III. SHELL'S CROSS-APPEAL*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. DISPOSITION

The judgment is affirmed. The parties shall bear their own costs.

Boren, P. J., and Zebrowski, J., concurred.

The petition of appellant National Union Fire Insurance Company of Pittsburg, Pa., for review by the Supreme Court was denied August 14, 1996.

*See footnote, *ante*, page 1633.