RAMIREZ, P.J.
*1022 This is an action by the State of California (State) to recover from various insurers the costs of cleaning up the Stringfellow hazardous waste site. It has been pending since 1993. It has been to this court three times and to the California Supreme Court twice. At this point, however, the only remaining insurers are the Continental Insurance Company and Continental Casualty Company (collectively Continental), and the only remaining issues relate to prejudgment interest.
In 2015, Continental paid the State its full policy limits of $12 million. The trial court ruled that the State was entitled to mandatory prejudgment interest on that amount at seven percent, dating back to 1998, and thus totaling $13,914,082.09. In the alternative, it also ruled that the State was entitled to discretionary prejudgment interest, at seven percent, dating back to 2002, and thus totaling $10,554,082.19.
Continental appeals. In the published portion of this opinion, we address its contentions that the award of mandatory prejudgment interest was erroneous because:
*1023 1. The award was premised on the trial court's erroneous ruling as to when Continental's policies attached.
2. The State was not entitled to mandatory prejudgment interest because the amount of its damages was uncertain.
Continental further contends that the award of discretionary prejudgment interest was erroneous because the trial court used an inapplicable interest rate.
Finding no error affecting the award of mandatory prejudgment interest, we will affirm it. Accordingly, we need not review the award of discretionary prejudgment interest.
I
FACTUAL BACKGROUND
Various insurers issued liability insurance policies to the State, such that the State had at least some coverage at all times from 1963 through 1978. Except for the 1963-1964 policy period, the State was *721 self-insured for the first $1, $2, or $5 million in liability, and it had a series of policies for liability above that, affording total coverage of either $50 or $51 million per policy period.
Continental (and/or its predecessors in interest) issued three of these policies:
Company Period Limits Retention Continental Casualty 1970-1973 $5 million $16 million Harbor 1970-1973 $5 million $16 million CNA Casualty 1973-1976 $2 million $25 million
Attachment A is a chart illustrating the amounts and policy periods of all of the relevant policies.
In 1983, the United States and the State, as plaintiffs, filed an action in federal court against numerous defendants, alleging that they were responsible for the contamination of the Stringfellow site. Some of the defendants filed counterclaims against the State. On July 28, 1988, the State gave notice of the counterclaims to its insurers, including Continental.
*1024 On September 11, 1998, the federal district court issued a "Judgment Pursuant to Rule 54(b)."[1] (Capitalization altered.) It defined the "plaintiffs" as the United States and the State. It also defined the "counterclaimants" as those defendants who had filed counterclaims against the State. These included J.B. Stringfellow, Stringfellow Quarry Co., and Stringfellow Quarry Co., Inc. (Stringfellow counterclaimants).
It declared that the State "is liable to counterclaimants" under both the Comprehensive Environmental Response, Compensation, and Liability Act ( 42 U.S.C. § 9601 et seq. ) (CERCLA) and state law.
For purposes of CERCLA, it found that the United States, the State, and the counterclaimants were all "liable persons." It allocated liability under CERCLA as follows:
a. The State was 65 percent liable "as against all [c]ounterclaimants."
b. The Stringfellow counterclaimants were 10 percent liable.
c. The remaining counterclaimants and the United States were 25 percent liable.
d. "[A]ny orphan share[ ] created by any party who is unable to pay its apportioned share under CERCLA ... shall be reallocated among the existing solvent parties in the same proportionate amounts as the above-described allocated CERCLA equitable shares."
For purposes of state law, it ruled: "Each counterclaimant is entitled to be paid by the State ... 100% (one hundred percent) of any damages which that counterclaimant has incurred or will incur." It specifically ruled that the counterclaimants' liability under state law was "0% (zero percent)." It added, "The Court finds that the state law claims are direct claims for damages."
*722 Finally, it provided: "[T]he United States has incurred certain costs of response in connection with the site which are consistent with the National Contingency Plan; those costs plus interest[ ] accrued through February 29, 1992 total $80,174,584.22."
The State filed an appeal from the Rule 54(b) judgment. It ultimately dismissed that appeal in 2002.
*1025 Meanwhile, in December 1998, the State entered into a settlement agreement with the counterclaimants. In it, the counterclaimants released the State from all claims for past costs incurred at the Stringfellow site. In return, the State agreed to assume all liability for the Stringfellow site, including the liability to reimburse the United States for past and future costs incurred.
In April 2001, the State entered into a settlement agreement with the United States, in which the State agreed to pay $99.4 million "for Response Costs ... that the United States incurred at the Site ...." In July 2001, the federal district court ordered this settlement agreement into effect as a consent decree. In August 2001, the State duly paid the United States $99.4 million.
Meanwhile, separate and apart from its liability to the United States and/or the counterclaimants, the State also carried out its own remediation work at the Stringfellow site. As of the time of trial, remediation work was still going on.
II
PROCEDURAL BACKGROUND
In 1993, the State filed an action against certain insurers, seeking to recover the costs of cleaning up the Stringfellow site. In 2002, the State filed a second action against additional insurers, including Continental. The two actions were consolidated; the defendants in the second action agreed to be bound by previous rulings in the first action. One of these previous rulings, in June 1999, was that the policy limits under a policy for a multi-year period applied once per policy period, not once per year (no-annualization ruling).
In March 2004, the trial court ruled that each insurer was potentially liable for the total amount of the loss (subject to its policy limits); it rejected the contention that each insurer could be liable only for the portion of the loss attributable to its own policy periods (all-sums ruling). At the same time, however, it also ruled that the State could not recover the policy limits in effect for every policy period. Instead, the State had to choose one policy period, and it could recover only up to the policy limits of the policies in effect during that period (no-stacking ruling).
In February 2005, the trial court ruled that, for purposes of policy limits, there had been only a single covered occurrence (one-occurrence ruling).
Meanwhile, a number of insurers had settled with the State. In March 2006, the trial court ruled that the amounts of these settlements, which *1026 totaled, at that point, approximately $120 million, had to be used to offset the other defendants' liability (offset ruling).
At that point, based on the one-occurrence, no-annualization and no-stacking rulings, the most the State could recover was $48 million. The $120 million in settlements was more than sufficient to offset this. Accordingly, the trial court entered a final judgment finding the defendants liable, but awarding the State zero damages.
The State appealed; the defendants cross-appealed. In 2009, we filed our opinion. ( State of California v. Continental Ins. Co. (2009) 88 Cal.Rptr.3d 288, review *723 granted Mar. 18, 2009.) We affirmed the no-annualization ruling ( id . at pp. 317-319 ), the all-sums ruling ( id . at pp. 297-302 ), and the one-occurrence ruling ( id . at pp. 313-317 ). We concluded that the offset ruling was moot. ( Id . at pp. 319-320.) However, we reversed the no-stacking ruling. ( Id . at pp. 302-313.)
In 2012, the California Supreme Court affirmed our decision. ( State of California v. Continental Ins. Co. (2012) 55 Cal.4th 186, 145 Cal.Rptr.3d 1, 281 P.3d 1000.)
On remand, the parties filed cross-motions for summary adjudication on the issue of whether Continental's policies attached immediately upon exhaustion of the specified retention for the specified policy period (vertical exhaustion) or only upon exhaustion of all retentions across all policy periods (horizontal exhaustion). In October 2014, the trial court ruled that vertical exhaustion applied (vertical exhaustion ruling). Thus, it granted the State's motion and denied Continental's motion.
In February 2015, the parties stipulated that Continental would pay its policy limits of $12 million, without any right of reimbursement, and that the trial court would proceed to determine all factual and legal issues regarding prejudgment interest. According to Continental, it paid the $12 million on April 6, 2015.
The parties filed prehearing briefs on the issue of prejudgment interest.
The State took the position that its damages were certain for purposes of prejudgment interest immediately upon the entry of the Rule 54(b) judgment, because the Rule 54(b) judgment made Continental liable for its full policy limits.
Continental argued, among other things, that:
*1027 1. The Rule 54(b) judgment did not make Continental liable at all, because it was not a judgment for damages.
2. The State's damages had not been certain, and could not have been made certain, until specific issues were adjudicated, including:
a. Whether horizontal exhaustion or vertical exhaustion applied.
b. How many occurrences there were.
c. Whether the policy limits applied per occurrence per policy period, or per occurrence per year.
d. Whether the policies could be stacked.
3. Before prejudgment interest, if any, could be calculated, Continental's liability had to be offset by amounts that the State had recovered in settlements with other insurers.
In July 2015, the trial court held a trial on the issue of prejudgment interest.
In August 2015, the trial court ruled that the State was entitled to mandatory prejudgment interest under Civil Code section 3287, subdivision (a), at a rate of seven percent, starting on September 11, 1998, the date of the Rule 54(b) judgment, totaling $13,914,082.09. Alternatively, in the event that the award of mandatory prejudgment interest was reversed on appeal, it ruled that the State was entitled to discretionary prejudgment interest under Civil Code section 3287, subdivision (b), at a rate of seven percent, starting on September 11, 2002, the date when this action was filed, in the amount of $10,554,082.19. It then entered judgment accordingly.
III
THE VERTICAL EXHAUSTION RULING
Continental contends that the award of prejudgment interest was erroneous because it was premised on the trial court's vertical exhaustion ruling, which was also erroneous.
*724 A. Additional Factual and Procedural Background .
In its policies, Continental promised to pay "all sums which the [State] shall become obligated to pay by reason of liability imposed by law ... for damages ...."
*1028 The "Limits of Liability" clause provided: "The limit of [Continental's] liability shall be ... [either $2 or $5 million] excess of [either $16 or $25 million] Ultimate Net Loss each occurrence (hereinafter called 'the insured's retention')." (Capitalization altered.)
"Ultimate Net Loss" was defined as "the amount payable in settlement of the liability of the [State] arising only from the hazards covered by this policy after making deductions for all recoveries and for other valid and collectible insurances excepting however policy/ies in respect of the insured's retention ...."
The "Other Insurance" clause stated:
"If the Insured has other valid and collectible insurance against a loss covered by this policy, the insurance extended by this policy shall be excess only, and not primary or contributing.
"The Insured may be insured when named as an insured or as an additional insured under policy/ies for all or any part of the Insured's retention ...."
Finally, the "Loss Payable" clause provided: "Liability under this policy with respect to any occurrence shall not attach unless and until the Insured shall have paid the amount of the Insured's retention on account of such occurrence."
In the trial court, the State asserted that "vertical exhaustion" applied, meaning that each excess policy attached upon exhaustion of the State's retention, as specified in that policy (either $16 million or $25 million), without regard to the exhaustion of any policies or retentions for any other policy period.
Attachment B is a chart showing how vertical exhaustion would work. Assuming vertical exhaustion applies, two of Continental's policies would attach when the State's covered losses reach $16 million, and all of them would attach when the State's covered losses reach $25 million.
Continental, on the other hand, asserted that "horizontal exhaustion" applied, meaning that no excess policy would attach until, not only the State's self-insured retention, but also the amounts of all lower-lying policies and retentions, over all applicable policy periods, had been exhausted. Continental also argued that the State was judicially estopped by various previous admissions that horizontal exhaustion applied.
Attachment C is a chart showing how horizontal exhaustion would work. Assuming horizontal exhaustion applies, Continental's policies would not *1029 attach until the State's covered losses reach either $101 million (as to the two policies with a $16 million retention) or $155 million (as to the one policy with a $25 million retention). Moreover, Continental's policies would not be fully exhausted until the State's covered losses reach $307 million. Continental has described horizontal exhaustion as the "rising bathtub" approach.
B. Discussion .
1. Continuous loss principles .
As background, we begin by discussing some general principles governing liability insurance coverage for a continuous loss over multiple policy periods. This discussion revolves around three California Supreme Court cases.
First, in Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 42 Cal.Rptr.2d 324, 913 P.2d 878, the Supreme *725 Court adopted the " 'continuous injury' trigger of coverage." ( Id . at p. 655, 42 Cal.Rptr.2d 324, 913 P.2d 878.)
"A key inquiry under 'occurrence' policies is what fact or event 'triggers' the insurer's duties to indemnify and/or defend the insured." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2016) ¶ 7:161, p. 7A-83.) "The issue is largely one of timing-what must take place within the policy's effective dates for the potential of coverage to be 'triggered'?" ( Montrose Chemical Corp. v. Admiral Ins. Co. , supra , 10 Cal.4th at p. 655, fn. 2, 42 Cal.Rptr.2d 324, 913 P.2d 878, italics omitted.) Based on standard policy language, Montrose held that "bodily injuries and property damage that are continuous or progressively deteriorating throughout successive policy periods are covered by all policies in effect during those periods." ( Id . at p. 675, 42 Cal.Rptr.2d 324, 913 P.2d 878 ; see also id . at p. 685, 42 Cal.Rptr.2d 324, 913 P.2d 878.)
Next, in Aerojet-General Corp. v. Transport Indem. Co. (1997) 17 Cal.4th 38, 70 Cal.Rptr.2d 118, 948 P.2d 909, the Supreme Court adopted the "all sums" approach.
In allocating a loss among insurers, some states follow a pro-rata approach, in which each insurer is liable only for its equitable share of the loss; usually that is determined by dividing the insurer's time on the risk by the total duration of the loss. (See State of California v. Continental Ins. Co. , supra , 55 Cal.4th at pp. 198-199, 145 Cal.Rptr.3d 1, 281 P.3d 1000.) In Aerojet , however, the Supreme Court held that, based on standard policy language, in which the insurer promises to pay "all sums" that the insured becomes legally obligated to pay as damages, the insurer's duty to indemnify the insured "extends to all specified harm caused *1030 by an included occurrence, even if some such harm results beyond the policy period. [Citation.]" ( Aerojet-General Corp. v. Transport Indem. Co. , supra , 17 Cal.4th at pp. 56-57, 70 Cal.Rptr.2d 118, 948 P.2d 909, fn. omitted.)[2]
Finally, in State of California v. Continental Ins. Co. , supra , 55 Cal.4th 186, 145 Cal.Rptr.3d 1, 281 P.3d 1000, the Supreme Court held that the insured is entitled to "stack" policy limits.
The question of stacking goes to whether the insured can recover the limits of multiple policies across multiple policy periods. Based, yet again, on standard policy language, the Supreme Court held that the insured is entitled to stack policy limits. ( State of California v. Continental Ins. Co. , supra , 55 Cal.4th at pp. 201-202, 145 Cal.Rptr.3d 1, 281 P.3d 1000.) "The all-sums-with-stacking indemnity principle properly incorporates the Montrose continuous injury trigger of coverage rule and the Aerojet all sums rule, and 'effectively stacks the insurance coverage from different policy periods to form one giant "uber-policy" with a coverage limit equal to the sum of all purchased insurance policies. Instead of treating a long-tail injury as though it occurred in one policy period, this approach treats all the triggered insurance as though it were purchased in one policy period. The [insured] has access to far more insurance than it would ever be entitled to within any one period.' [Citation.]" ( Id. at p. 201, 145 Cal.Rptr.3d 1, 281 P.3d 1000.)
2. Primary and excess insurance principles .
We also need to discuss primary and excess insurance. "Primary insurance ...
*726 provides immediate coverage upon the 'occurrence' of a 'loss' or the 'happening' of an 'event' giving rise to liability: 'Primary coverage is insurance coverage whereby ... liability attaches immediately upon the happening of the occurrence that gives rise to liability.' [Citations.]" (Croskey et al., supra , ¶ 8:176, p. 8-59.) "Excess insurance ... provides coverage after other identified insurance is exhausted." (Id ., ¶ 8:177, p. 8-59.)
Most excess policies are written as excess to a specified primary policy. Alternatively, however, a policy may be written as excess to an insured's retention. " 'The term "retention" (or "retained limit") refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied before there is any coverage under the policy. ...' [Citation.]" ( Forecast Homes, Inc. v. Steadfast Ins. Co. (2010) 181 Cal.App.4th 1466, 1474, 105 Cal.Rptr.3d 200.) "The insured may purchase other insurance to cover the [retention] unless the policy clearly requires the insured itself, not other *1031 insurers, to pay this amount. [Citations.]" (Croskey et al., supra , ¶ 7:385.5, p. 7A-156, italics omitted.) If the insured does not purchase insurance to cover the retention and instead bears the risk itself, the retention is called a self-insured retention.
Here, the "Other Insurance" clause permitted (though it did not require) the State to buy other insurance covering some or all of its retention. Moreover, in every policy period, the State did in fact buy other insurance covering all but the first $1 million, $2 million, or $5 million of its retention. Only the uncovered portion was a true self-insured retention.
3. Standard of review .
The trial court made its vertical exhaustion ruling on a motion for summary adjudication. ( Code Civ. Proc., § 437c, subd. (f)(1).) "Motions for summary adjudication are procedurally identical to motions for summary judgment [citation], and our review of rulings on those motions is de novo [citation]." ( Dunn v. County of Santa Barbara (2006) 135 Cal.App.4th 1281, 1290, 38 Cal.Rptr.3d 316.)
4. Because the policies were written in excess of a retention, vertical exhaustion applies .
We now turn to Continental's arguments in favor of horizontal exhaustion. These are of two types, arguments based on the policy language, and arguments based on case law. We discuss these seriatim.
"[Exhaustion] cases, like all other insurance cases, look first to the terms of the policy." ( Montgomery Ward & Company, Inc. v. Imperial Cas. & Indem. Co. (2000) 81 Cal.App.4th 356, 368, 97 Cal.Rptr.2d 44 ; accord, Community Redevelopment Agency v. Aetna Casualty & Surety Co. (1996) 50 Cal.App.4th 329, 338-340 & fn. 6, 57 Cal.Rptr.2d 755.)
"The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citation.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the objectively reasonable expectations of the insured.' " [Citation.] Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. [Citation.]' [Citation.]" ( Minkler v. Safeco Ins. Co. of America (2010) 49 Cal.4th 315, 321, 110 Cal.Rptr.3d 612, 232 P.3d 612.)
*1032 *727 The "Limits of Liability" clause seems plain enough: Continental's liability attaches upon an "Ultimate Net Loss" that is in excess of the specified ($16 or $25 million) retention. This would seem to be the very definition of vertical exhaustion.
Continental relies, however, on the definition of "Ultimate Net Loss," and also on the "Other Insurance" clause. These both provided, essentially, that Continental's policy was excess to any other insurance. However, there are two problems with this.
First, and most glaringly, these clauses are not limited to lower-layer insurance. As written, they purport to provide that Continental simply is not liable as long as there is any other unexhausted insurance-including policies in the same layer. There is no language in Continental's policies that would make them excess to lower-layer policies for other policy periods, but not to same-layer policies for other policy periods. Thus, the policy language simply does not support Continental's proposed rising bathtub approach.
Second, other-insurance clauses are intended to apply in contribution actions between insurers, not in coverage litigation between insurer and insured. In Dart Industries, Inc. v. Commercial Union Ins. Co. (2002) 28 Cal.4th 1059, 124 Cal.Rptr.2d 142, 52 P.3d 79, the Supreme Court stated: " '[A]pportionment among multiple insurers must be distinguished from apportionment between an insurer and its insured. When multiple policies are triggered on a single claim, the insurers' liability is apportioned pursuant to the "other insurance" clauses of the policies [citation] or under the equitable doctrine of contribution [citations]. That apportionment, however, has no bearing upon the insurers' obligations to the policyholder. [Citation.] A pro rata allocation among insurers "does not reduce their respective obligations to their insured." [Citation.] The insurers' contractual obligation to the policyholder is to cover the full extent of the policyholder's liability (up to the policy limits).' [Citations.] This principle is consistent with 'the settled rule that an insurer on the risk when continuous or progressively deteriorating damage or injury first manifests itself remains obligated to indemnify the insured for the entirety of the ensuing damage or injury.' [Citation.]" ( Id . at p. 1080, 124 Cal.Rptr.2d 142, 52 P.3d 79 ; see also Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc. (2000) 78 Cal.App.4th 847, 899, 93 Cal.Rptr.2d 364 [ Montrose "implies that [the insurer] was bound by an obligation to indemnify [the insured] for the whole amount of the loss, without taking into account any contribution that [another insurer] might be obligated to make."]; FMC Corp. v. Plaisted & Companies (1998) 61 Cal.App.4th 1132, 1185, 72 Cal.Rptr.2d 467 ["[T]he availability of allocation among multiple insurers is essentially irrelevant to each individual insurer's obligation to its insured under the terms of the parties' insurance contract."], disapproved on other grounds in *1033 State of California v. Continental Ins. Co. , supra , 55 Cal.4th at p. 201, 145 Cal.Rptr.3d 1, 281 P.3d 1000.) We see no reason to treat the other insurance clause in this case differently just because it was repeated and incorporated into the definition of Ultimate Net Loss.
Continental argues that Dart is inapplicable because it did not involve any issue as to excess policies or exhaustion. Nevertheless, the language that we have quoted was not dictum. The Supreme Court was explaining why it did not need to know whether a lost primary policy had an other-insurance clause to determine whether the issuer had a duty to indemnify its insured. ( *728 Dart Industries, Inc. v. Commercial Union Ins. Co. , supra , 28 Cal.4th at pp. 1080-1081, 124 Cal.Rptr.2d 142, 52 P.3d 79.) And " ' "[e]ven if properly characterized as dictum, statements of the Supreme Court should be considered persuasive. [Citation.]" [Citation.]' [Citation.]" ( Arteaga v. Superior Court (2015) 233 Cal.App.4th 851, 865, 182 Cal.Rptr.3d 914.)
Third, as the State aptly points out, "Under [Continental]'s approach, a court could not determine the amount any insurer owes without first determining what every insurer owes ...." (Fn. omitted.) For example, if a lower-layer insurer for a different policy period happened to claim that some exclusion in its policy applied, a court could not determine whether Continental's policies were triggered without first determining that exclusion claim. This would deprive the State of the timely indemnity that it bargained for.
We turn, then, to Continental's argument based on the case law. Continental relies primarily on Community Redevelopment Agency v. Aetna Casualty & Surety Co. , supra , 50 Cal.App.4th 329, 57 Cal.Rptr.2d 755, which held that, in the case of a continuous loss across multiple policy periods, horizontal exhaustion ordinarily applies to primary insurance. In Community , several developers had been sued in related construction defect cases. ( Id . at pp. 333-334, 57 Cal.Rptr.2d 755.) Two insurers (United and State Farm) had each issued primary policies, covering two different policy periods, to the developers; a third insurer (Scottsdale) had issued an umbrella policy to one of the developers. ( Id . at p. 334, 57 Cal.Rptr.2d 755.) The umbrella policy provided that it was excess to the State Farm policy-which was specifically listed as "underlying insurance"-and also to "the applicable limits of any other underlying insurance ...." ( Id . at p. 335, 57 Cal.Rptr.2d 755, italics omitted.) United paid for the developers' defense. ( Id . at p. 336, 57 Cal.Rptr.2d 755.) One of the claimants settled with one of the developers, and State Farm paid out its policy limits to fund the settlement. ( Id . at p. 336, 57 Cal.Rptr.2d 755.) United then sought to compel Scottsdale to contribute toward its defense costs. ( Id . at p. 332, 57 Cal.Rptr.2d 755 & fn. 1.)
The appellate court held that Scottsdale had no duty to defend under its excess policy until both the State Farm and United primary policies were exhausted. ( *1034 Community Redevelopment Agency v. Aetna Casualty & Surety Co. , supra , 50 Cal.App.4th at p. 342, 57 Cal.Rptr.2d 755.) It stated: "It is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until all of the primary insurance has been exhausted. [Citation.]" ( Id . at p. 339, 57 Cal.Rptr.2d 755.) "This is a particular problem in continuous loss cases, such as the one before us." ( Id . at p. 340, 57 Cal.Rptr.2d 755.) "[P]rimary policies may have defense and coverage obligations which make them underlying insurance to excess policies which were effective in entirely different time periods and which may not have expressly described such primary policies as underlying insurance. Absent a provision in the excess policy specifically describing and limiting the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in Montrose . In other words, all of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. Under the principle of horizontal exhaustion, all of the primary policies must exhaust before any excess will have coverage exposure." ( Ibid . ; accord, Padilla Const. Co., Inc. v. Transportation Ins. Co. (2007) 150 Cal.App.4th 984, 986-987, 58 Cal.Rptr.3d 807 ; *729 Olympic Ins. Co. v. Employers Surplus Lines Ins. Co. (1981) 126 Cal.App.3d 593, 600-601, 178 Cal.Rptr. 908 ; Iolab Corp. v. Seaboard Sur. Co. (9th Cir. 1994) 15 F.3d 1500, 1504 [applying California law].)
Community is not controlling, because here the applicable policies were not neatly divided into a primary level and an excess level. With one negligible exception,[3] all of the applicable policies were excess to a retention. The lowest-layer policies were excess to the State's true self-insured retention (e.g., in the 1970-1973 policy period, $2 million); the higher-layer policies were excess to a retention in a specified dollar amount (e.g., Continental's policies for the 1970-1973 policy period had a retention of $16 million), which the State filled in with other insurance. Thus, no policy was written as excess to any other specified policy , although some became excess to another policy or policies as the result of the State's decision to purchase other insurance to cover its retention.
Community reasoned that a primary policy is qualitatively different from an excess policy; the defense and indemnity obligations under a primary policy are immediate, whereas under an excess policy, they are merely contingent.[4] Thus, an excess insurer should not be required to defend or to indemnify as long as any primary insurer is still sitting on its hands. The *1035 same is not true of two insurers who have issued policies that are excess to a retention. Their defense and indemnity obligations are both contingent, and they have priced their premiums accordingly. We cannot say, from their relationship alone, that either one should have to exhaust before the other is liable.
Community also noted that Scottsdale's policy provided generally that it was excess to " 'the applicable limits of any other underlying insurance collectible by the [insured parties].' " ( Community Redevelopment Agency v. Aetna Casualty & Surety Co. , supra , 50 Cal.App.4th at p. 338, 57 Cal.Rptr.2d 755.) Here, by contrast, the other insurance provisions (including the "Ultimate Net Loss" definition) were not limited to other "underlying" insurance; rather, they purported to make Continental's policies excess to any other insurance whatsoever. And as the State points out, all the other policies had similar other insurance provisions, purporting to make them excess to any other insurance whatsoever. Thus, these provisions did not make any policy excess to any particular primary policy.
Under these circumstances, Montgomery Ward & Company, Inc. v. Imperial Cas. & Indem. Co. , supra , 81 Cal.App.4th 356, 97 Cal.Rptr.2d 44 -which held that in the case of a continuous loss across multiple policy periods, vertical exhaustion ordinarily applies to self-insured retentions -is more apropos. There, Montgomery Ward was sued for environmental contamination over a period of years. Four insurers had issued policies to Montgomery Ward, each covering part of the relevant time period; each policy was subject to a self-insured retention. ( Id . at pp. 361-362 & 361, fn. 2, 97 Cal.Rptr.2d 44.) The trial court ruled that "all [self-insured retentions] for all policies in effect over the period of continuing damage ... were the equivalent of primary insurance, and must *730 be exhausted before the excess insurers had any obligation to indemnify Montgomery Ward." ( Id . at p. 363, 97 Cal.Rptr.2d 44.)
The appellate court reversed. It held that self-insured retentions "are not primary insurance and the principle of horizontal exhaustion does not apply." ( Montgomery Ward & Company, Inc. v. Imperial Cas. & Indem. Co. , supra , 81 Cal.App.4th at p. 364, 97 Cal.Rptr.2d 44.) It noted that, in each policy, the insurer promised to indemnify Montgomery Ward for the ultimate net loss in excess of a specified dollar amount (usually $50,000.) ( Id . at p. 366, 97 Cal.Rptr.2d 44.) The court acknowledged that the polices also provided that they were excess to other valid and collectible insurance, but it reasoned that a self-insured retention is not insurance. ( Id . at pp. 367-370, 97 Cal.Rptr.2d 44 ; accord, Legacy Vulcan Corp. v. Superior Court (2010) 185 Cal.App.4th 677, 696-697, 110 Cal.Rptr.3d 795 ; California Pacific Homes, Inc. v. Scottsdale Ins. Co. (1999) 70 Cal.App.4th 1187, 1192-1195, 83 Cal.Rptr.2d 328.)
*1036 The court specifically distinguished Community : "[ Community ] does not stand for the proposition all primary coverage must be exhausted before excess policies may be reached without regard to the terms of the excess policies. Indeed, the [ Community ] court said '[i]f an excess policy states that it is excess over a specifically described policy and will cover a claim when that specific primary policy is exhausted, such language is sufficiently clear to overcome the usual presumption that all primary coverage must be exhausted.' [Citation.] Here, the Insurers' policies state they are excess over a specifically described [retention] and will cover a claim when that [retention] is exhausted." ( Montgomery Ward & Company, Inc. v. Imperial Cas. & Indem. Co. , supra , 81 Cal.App.4th at pp. 368-369, 97 Cal.Rptr.2d 44.)
Admittedly, this is something of a hybrid case. The State argues that Continental's policies were excess to a retention; under Montgomery Ward , self-insured retentions exhaust vertically. However, Montgomery Ward involved true self-insured retentions. Here, the State covered most of its retentions by buying lower-level policies. Accordingly, Continental argues that under Community , primary policies exhaust horizontally. However, Community involved true primary policies; here, the State had only policies that were excess to various retentions.
We believe that, under these circumstances, Montgomery Ward , and not Community , should be controlling. Certainly if the State had had nothing but true self-insured retentions, vertical exhaustion would be the rule; Continental would not be entitled to the benefit of any self-insured retentions for any other policy periods. It would be paradoxical if the fact that the State prudently decided to protect itself further by buying insurance covering most of its retentions actually made it harder for the State to obtain indemnity from any one insurer.[5]
*731 Under Montgomery Ward , Continental's rising bathtub model is clearly wrong in at least one respect. Continental states that "all underlying policy limits and self-insured retentions across the years of continuing property damage must be exhausted ... before any of [Continental's] excess policies are obligated to pay covered claims." (Bolding omitted, italics added.) However, the State was not required to exhaust its true self-insured retentions *1037 for any other policy periods. Continental does not point to any particular language in its own policies that even arguably so requires. Each Continental policy is excess to the State's retention for that policy period, but not for any other policy periods.
More generally, however, Continental's rising bathtub model is also wrong with respect to exhaustion of lower-layer policies. Aside from the other-insurance clauses, which are not specific to other lower-layer insurance, there was simply no policy language requiring exhaustion of any other insurance. Rather, the policies provided that Continental's duty to pay arose as soon as the specified retention was exhausted.
We therefore conclude that the trial court correctly ruled that only vertical exhaustion was required.
5. We did not decide this issue in the previous appeal .**
IV-V.***
VI
THE AMOUNT OF THE STATE'S DAMAGES WAS CERTAIN
Continental contends that the trial court erred by awarding prejudgment interest because damages could not be ascertained until after the trial court made a series of rulings.
A. General Background Principles .
Civil Code section 3287, subdivision (a), as relevant here, provides: "A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day ...."
*1038 "[T]he primary purpose of [Civil Code] section 3287(a)'is to provide just compensation to the injured party for loss of use of the [underlying] award during the prejudgment period-in other words, to make the plaintiff whole as of the date of the injury.' [Citations.]" ( Flethez v. San Bernardino County Employees Retirement Assn. (2017) 2 Cal.5th 630, 643, 214 Cal.Rptr.3d 482, 389 P.3d 1232.)
" 'Under this provision, prejudgment interest is allowable where the amount due plaintiff is fixed by the terms of a contract ....' [Citation.] If damages are 'certain,' interest must be awarded as a matter of right. [Citations.]" ( National Farm Workers Service Center, Inc. v. M. Caratan, Inc. (1983) 146 Cal.App.3d 796, 809, 194 Cal.Rptr. 617.) "Courts generally apply a liberal construction in determining whether a claim is certain .... [Citation.]" ( Howard v. American Nat. Fire Ins. Co. (2010) 187 Cal.App.4th 498, 535, 115 Cal.Rptr.3d 42.)
" 'On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a factual dispute as to what information was *732 known or available to the defendant at the time.' [Citation.]" ( Watson Bowman Acme Corporation v. RGW Construction, Inc. (2016) 2 Cal.App.5th 279, 296, 206 Cal.Rptr.3d 281.)
Our Supreme Court has stated that: "[T]he certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability. [Citations.]" ( Olson v. Cory (1983) 35 Cal.3d 390, 402, 197 Cal.Rptr. 843, 673 P.2d 720.)
In Continental's view, this test sets up a dichotomy between liability and damages -i.e., a dispute over damages precludes certainty, but a dispute over liability does not. And there is language in the case law that supports this view. For example, the Supreme Court has stated: " 'Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage. [Citation.]' [Citations.]" ( Leff v. Gunter (1983) 33 Cal.3d 508, 519-520, 189 Cal.Rptr. 377, 658 P.2d 740, italics added.)
In the State's view, however, it sets up a dichotomy between legal issues and factual issues -i.e., a dispute over a factual issue precludes certainty, but a dispute over a legal issue does not. Once again, language can be found in the case law to support this view. For example, in Collins v. City of Los Angeles (2012) 205 Cal.App.4th 140, 139 Cal.Rptr.3d 880, the court stated:
*1039 "[A] legal uncertainty concerning the measure of damages rather than a factual uncertainty ... does not prevent damages from being ascertainable." ( Id . at p. 152, 139 Cal.Rptr.3d 880 ; see also Benson v. City of Los Angeles (1963) 60 Cal.2d 355, 366, 33 Cal.Rptr. 257, 384 P.2d 649.)
The State has the better side of the argument. At least in insurance cases, what has been treated as controlling is whether the uncertainty is legal or factual. What portion of a loss will be allocated to a given insurer has been treated as a matter of the extent of liability, not a matter of damages-at least when it does not turn on disputed factual issues.
For example, in Hartford Accident & Indemnity Co. v. Sequoia Ins. Co. (1989) 211 Cal.App.3d 1285, 260 Cal.Rptr. 190, Hartford had issued both a primary policy and an umbrella policy to the owners of a car that was involved in an accident ( id . at pp. 1290-1292, 260 Cal.Rptr. 190 ); Sequoia had issued a primary policy and Transamerica had issued an umbrella policy to the driver of the car. ( Id . at pp. 1290-1291, 1293-1296, 260 Cal.Rptr. 190.) After Hartford settled the claims of the injured passengers for an amount in excess of $1.8 million, it sued Sequoia and Transamerica for contribution. ( Id . at p. 1291, 260 Cal.Rptr. 190.) The trial court granted summary judgment for Hartford; it awarded Hartford the full amount of the Sequoia policy and a pro rata amount of the Transamerica policy. ( Id . at pp. 1291, 1307, 260 Cal.Rptr. 190 ; see also id . at p. 1293, 260 Cal.Rptr. 190.)
The appellate court held that Hartford was entitled to prejudgment interest on the award against Transamerica. ( Hartford Accident & Indemnity Co. v. Sequoia Ins. Co. , supra , 211 Cal.App.3d at pp. 1305-1307, 260 Cal.Rptr. 190.) Transamerica argued that prejudgment interest was not available because "the amount of liability, if any, remain[ed] in dispute until judgment." ( Id . at p. 1307, 260 Cal.Rptr. 190.) The appellate court responded that although "Hartford's right to recover damages from Transamerica ... was in issue, *733 the amount of damages recoverable was 'certain, or capable of being made certain by calculation' and was 'vested' in Hartford on ... the day Hartford exhausted its primary policy limit and first paid out money under its umbrella policy. Assuming Hartford was entitled to recover damages, the only question remaining was how the trial court would prioritize the policies. In this respect, the trial court had only two options: (1) to hold, as it did, that the Sequoia policy was second in order and that the Hartford and Transamerica policies share the excess liability on a prorata basis, or (2) that the Hartford [u]mbrella policy and the combined limits of the Sequoia and Transamerica policies be prorated. This was purely a question of law since the amount of damages under either formula was readily ascertainable by mathematical calculation. Thus, the amount of damages were never 'unliquidated' or 'contingent' but rather, only the legally proper order of priority of the respective policies was uncertain. Under these circumstances, Hartford is entitled to prejudgment interest." ( Id . at p. 1307, 260 Cal.Rptr. 190.) *1040 Continental argues that Hartford is not on point because there, "there was no dispute as to the methodology to be applied to the allocation ...." In light of the court's own discussion of the two alternative methodologies, this is clearly inaccurate. Rather, what was crucial in Hartford was that the choice of methodology was a legal issue, not a factual issue.
Similarly, in Fireman's Fund Ins. Co. v. Allstate Ins. Co. (1991) 234 Cal.App.3d 1154, 286 Cal.Rptr. 146, Fireman's, Allstate, and Northbrook each admittedly insured at least one of the parties involved in a truck-car collision. ( Id . at pp. 1158-1159, 286 Cal.Rptr. 146.) After settling with the injured passengers ( id . at p. 1158, 286 Cal.Rptr. 146 ), all three insurers filed cross-actions for declaratory relief. ( Id . at pp. 1159-1160, 286 Cal.Rptr. 146.) The trial court ruled that Fireman's was required to contribute its full policy limits. ( Id . at pp. 1160-1161, 286 Cal.Rptr. 146.)
The appellate court upheld this ruling. ( Fireman's Fund Ins. Co. v. Allstate Ins. Co. , supra , 234 Cal.App.3d at pp. 1161-1172, 286 Cal.Rptr. 146.) It further held that Allstate and Northbrook were entitled to prejudgment interest against Fireman's. ( Id . at pp. 1172-1174, 286 Cal.Rptr. 146.) It explained: "Here, the principal dispute was one of liability .... Once liability was established, the extent of that liability was no longer a question. ... [¶] Whatever uncertainty about the extent of Fireman's liability may have been fostered by the alternative theories Fireman's proposed, we do not view that uncertainty as an impediment to the award of prejudgment interest. While Fireman's proposed a general formula based on four inapt theories of lesser liability, it also suggested a specific amount due Allstate and Northbrook under each theory. Through it all, the extent of Fireman's exposure remained purely a question of law. ... By pursuit of its various suggested alternatives, Fireman's could neither confuse the magnitude of its obligation nor alter applicable law." ( Fireman's Fund Ins. Co. v. Allstate Ins. Co. , supra , 234 Cal.App.3d at pp. 1173-1174, 286 Cal.Rptr. 146.)
Continental argues that Fireman's is not controlling because there, according to Continental, the only disputed issue was whether Fireman's had validly canceled its policy. Once again, the court's own discussion of Fireman's four alternative theories demonstrates that this is incorrect.
Finally, in Shell Oil Co. v. National Union Fire Ins. Co. (1996) 44 Cal.App.4th 1633, 52 Cal.Rptr.2d 580, an injured worker sued Shell as well as S.I.P., an engineering firm that was doing work at a Shell refinery. ( *734 Id . at pp. 1637-1638, 52 Cal.Rptr.2d 580.) National had issued a policy to S.I.P. ( Id . at p. 1638, 52 Cal.Rptr.2d 580.) National paid its policy limits to settle the case against S.I.P., but it denied that its policy afforded any coverage to Shell. Shell then sued National. The trial court ruled that Shell was covered as an additional insured. It awarded Shell half the policy limits as damages; it also awarded prejudgment interest. ( Id . at p. 1639, 52 Cal.Rptr.2d 580.) *1041 On appeal, National argued that Shell was not entitled to prejudgment interest "because [Shell had] proposed three different measures of damages to the [trial] court, all of which were in dispute." ( Shell Oil Co. v. National Union Fire Ins. Co. , supra , 44 Cal.App.4th at p. 1651, 52 Cal.Rptr.2d 580, fn. omitted.) The appellate court disagreed, stating: "Shell's alternative theories required only the court's legal determination of which was appropriate; the amount of damages would thereby be fixed. The present case thus resembles Hartford ...." ( Ibid . )
Continental asserts that in Shell , "the issue with respect to prejudgment interest did not concern damages. Instead, it turned on whether the insurer was liable to cover Shell. The distinction was not between legal issues and factual issues, but between coverage liability and damages." Admittedly, there was a dispute over coverage. However, that was not why National claimed that damages were uncertain. Rather, it claimed that damages were uncertain because Shell had proposed three alternative measures of damages. Moreover, the appellate court rejected this argument expressly because the correct measure of damages presented only a legal issue.
It has been said that "[a] legal dispute concerning the defendant's liability or the proper measure of damages ... does not render damages unascertainable. [Citations.]" ( Collins v. City of Los Angeles , supra , 205 Cal.App.4th at p. 151, 139 Cal.Rptr.3d 880, italics added; accord, Uzyel v. Kadisha (2010) 188 Cal.App.4th 866, 919, 116 Cal.Rptr.3d 244.) This formulation is consistent with Hartford , Fireman's , and Shell , and we agree with it.
Continental nevertheless argues that *735 St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mut. Ins. Co. (2012) 210 Cal.App.4th 645, 148 Cal.Rptr.3d 625 supports the proposition that whenever "the amount of damages ... depends upon a resolution in court, prejudgment interest is not available ...." We disagree.
St. Paul was the liability insurer for a general contractor. ( St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mut. Ins. Co. , supra , 210 Cal.App.4th at p. 650, 148 Cal.Rptr.3d 625.) After settling a construction defect action against its insured ( id . at pp. 651-652, 148 Cal.Rptr.3d 625 ), St. Paul sued Mountain West-the insurer of a subcontractor-for contribution. ( Id . at pp. 650, 652, 148 Cal.Rptr.3d 625.)
The appellate court upheld the judgment against Mountain West. ( St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mut. Ins. Co. , supra , 210 Cal.App.4th at pp. 653-664, 148 Cal.Rptr.3d 625.) Among other things, it held that the trial court did not abuse its discretion by allocating 43 percent of the defense costs to Mountain West, based, in part, on its factual findings about the parties' relative responsibility for the construction defects. ( Id . at pp. 662-664, 148 Cal.Rptr.3d 625.) It further held that the trial court did not abuse its discretion by allocating *1042 settlement costs using the time-on-the-risk theory rather than the premiums-paid theory or any of the other available theories. ( Id . at p. 664, 148 Cal.Rptr.3d 625.)
It then reversed the award of prejudgment interest. ( St. Paul Mercury Ins. Co. v. Mountain West Farm Bureau Mut. Ins. Co. , supra , 210 Cal.App.4th at pp. 665-666, 148 Cal.Rptr.3d 625.) It acknowledged that "[g]enerally, nonparticipating coinsurers can be 'liable for interest on their prorated share of the loss, computed from the date of settlement' because that is the date that the loss is certain or capable of being made certain by calculation. [Citation.]" ( Id . at p. 665, 148 Cal.Rptr.3d 625.) However, it continued: "Here, no dispute existed about the amounts paid in settlement; the parties stipulated to the sum. Indeed, ... '[t]he settlement and the amount of the settlement are ... presumptive evidence of the insurer's liability and the amount of liability. [Citation.]' [Citation.] However, the issues at trial included not only legal questions about whether Mountain West was responsible for contribution, but also the allocation of responsibility and hence the amount of that contribution. The trial court was asked to choose the method of allocation, i.e., the basis for computation, and to calculate the exact portion of the stipulated defense and settlement costs Mountain West would have to contribute. Thus, Mountain West was not able to compute the damages [citation] and its share of the loss was not ' "certain, or capable of being made certain by calculation" ' [citations] until the trial court determined what method of allocation was most equitable. Consequently, the trial court erred in awarding prejudgment interest." ( Id . at pp. 665-666, 148 Cal.Rptr.3d 625.)
We perceive no conflict between St. Paul and the cases we have cited ( Hartford , Fireman's , and Shell ). Collectively, they stand for one simple test: When the allocation of indemnity among insurers turns on factual issues, damages are uncertain and pretrial interest is unavailable; when it turns exclusively on legal issues, damages are certain and pretrial interest is available.[8]
Continental complains that it could not know how much, if anything, it should pay the State until the trial court made (1) the no-annualization ruling, (2) the all-sums ruling, (3) the no-stacking ruling, (4) the one-occurrence *1043 ruling, and (5) the vertical exhaustion ruling.[9] This argument, based on fairness, has a certain superficial appeal. However, it cannot be squared with the well-established principle that damages can be deemed certain even if the defendant wholly denies liability for them. ( Leff v. Gunter , supra , 33 Cal.3d at pp. 519-520, 189 Cal.Rptr. 377, 658 P.2d 740 ; accord, Howard v. American Nat. Fire Ins. Co. , supra , 187 Cal.App.4th at p. 535, 115 Cal.Rptr.3d 42 ; Boehm & Associates v. Workers' Comp. Appeals Bd. (1999) 76 Cal.App.4th 513, 517, 90 Cal.Rptr.2d 486.) This is the rule, despite the fact that the *736 defendant can hardly be expected to pony up until its liability has been finally adjudicated.
What is critical is not whether the defendant actually knows how much it should pay; rather, it is whether the defendant could have calculated how much it should pay, if it had known how a court would ultimately rule on the legal issues. (See, e.g., Olson v. Cory , supra , 35 Cal.3d at p. 402, 197 Cal.Rptr. 843, 673 P.2d 720 [parties' dispute over legal issue of whether city charter amendment was unconstitutional did not prevent damages from being certain].)
We now apply these principles to Continental's various claims of uncertainty.
B. Uncertainty Regarding Vertical Exhaustion .
First, Continental contends that the damages were uncertain as long as there was a dispute as to whether vertical or horizontal exhaustion applied.
This dispute, however, presented a purely legal question, turning on the interpretation of the relevant policy language. The trial court made its ruling that vertical exhaustion applied as a matter of law, in the context of cross-motions for summary judgment. In part III, ante , we reviewed that ruling as a matter of law, and we affirmed it.
Continental nevertheless argues that this issue goes to damages rather than liability, and hence damages were uncertain until it was finally resolved. As already discussed, however, the liability-damages dichotomy is not controlling; rather, what is controlling is the legal-factual dichotomy.
If only out of an excess of caution, however, we note that the exhaustion issue actually does go to liability. It must be remembered that the liability at issue is not the State's liability for remediation costs, which continues to *1044 mount; rather, it is Continental's contractual liability to the State. Moreover, for purposes of prejudgment interest, the key question was whether, at the moment the Rule 54(b) judgment was entered, all applicable retentions and lower-level policies were exhausted. If vertical exhaustion applied, then the answer was yes; Continental's policies not only attached, but were fully exhausted, so that Continental was liable for its policy limits. On the other hand, if horizontal exhaustion applied, then, as Continental concedes, "$80 million would not have begun to implicate [Continental's] policies, much less exhaust them." I.e., at that moment , Continental was not liable at all.
C. Uncertainty Regarding the Number of Occurrences .
Next, Continental contends that the damages were uncertain as long as there was a dispute as to whether there was one covered occurrence or five covered occurrences.
Each insurer's policy limits applied on a "per occurrence" basis. (See State of California v. Continental Ins. Co. , supra , 88 Cal.Rptr.3d at pp. 295-296.) Continental argues that, if there were five occurrences, "that would have resulted in five times the underlying limits that would need to be exhausted before [Continental's] excess policies were triggered."
Again, this dispute presented a purely legal question that turned on the interpretation of the relevant policy language. The parties presented this issue in the trial court in the form of a motion for summary judgment and, in the alternative, a motion in limine. ( State of California v. Continental Ins. Co. , supra , 88 Cal.Rptr.3d at p. 314.) The trial court resolved it by applying the law to the undisputed facts.
*737 In the previous appeal, we affirmed the trial court's one-occurrence ruling. We held that the five occurrences listed by the State (reduced to four by the time of the appeal) actually constituted only one occurrence as a matter of law. ( State of California v. Continental Ins. Co. , supra , 88 Cal.Rptr.3d at pp. 313-317.)
Continental nevertheless argues that this issue goes to damages rather than liability. Once again, however, it actually does go to liability. We may assume, without deciding, that Continental's analysis of the impact of the one-occurrence ruling is correct. Even if so, however, that ruling determines whether, upon entry of the Rule 54(b) judgment, Continental was or was not liable. Continental has not shown that there was any scenario in which it was liable for some amount between $0 and $12 million, but the exact amount turned on the one-occurrence ruling.
D. Uncertainty Regarding Annualization .
Continental also contends that the damages were uncertain as long as there was a dispute as to whether policy limits applied per year or per multi-year *1045 policy period. It argues that, if annualization applied, there would be a larger pool of money that would have to be exhausted before Continental's policies would be triggered.
Once again, this dispute presented a purely legal question. In its no-annualization ruling, the trial court ruled that policy limits applied just once per policy period. Although it held a bench trial and took evidence, it indicated it reached this particular ruling as a "conclusion[ ] of law," based on "the plain meaning rule" as applied to the relevant policy provisions. We affirmed this ruling, also as a matter of law. ( State of California v. Continental Ins. Co. , supra , 88 Cal.Rptr.3d at pp. 317-319.)
Also, like the one-occurrence ruling, the no-annualization ruling, if relevant at all, goes to whether Continental's policies attached, which is a question of liability.
E. Uncertainty Regarding "All-Sums" and Stacking .
Finally, Continental contends that the damages were uncertain as long as there were disputes over the all-sums approach and stacking.
Yet again, these disputes presented purely legal questions. The trial court rendered its all-sums ruling on motion, as a question of law, based on case law that it deemed to be controlling. The Supreme Court affirmed this ruling; it held as a matter of law that the all-sums approach follows from standard policy language. ( State of California v. Continental Ins. Co. , supra , 55 Cal.4th at pp. 196-200, 145 Cal.Rptr.3d 1, 281 P.3d 1000.) For similar reasons, it further held that stacking applied. ( Id . at pp. 200-202, 145 Cal.Rptr.3d 1, 281 P.3d 1000.)
And again, these rulings go to whether Continental's policies attached at all; this is a question of liability, not damages. As Continental itself states, "under a 'pro rata' approach, even $300 million in damages would not have impacted [Continental's] policies because the damages would have been spread over the period of continuing property damage-here, a period of almost 50 years. ... [T]hat would be about $6 million each year, which would not implicate [Continental's] policies even on a vertical basis." Indeed, because all of Continental's policies were excess to retentions of at least $16 million, it would have taken $800 million in damages over 50 years to trigger them on a pro rata basis.
*738 VII.†
*1046 VIII
DISPOSITION
The judgment is affirmed. The State is awarded costs on appeal against Continental.
We concur:
McKINSTER, J.
SLOUGH, J.
*1047 Appendix *1048 --------

Rule 54(b) of the Federal Rules of Civil Procedure allows a trial court to enter "a final judgment as to one or more, but fewer than all, claims or parties ...."

An insurer that pays more than its pro rata share may then be able to obtain contribution from the other insurers. (State of California v. Continental Ins. Co., supra, 55 Cal.4th at p. 200, 145 Cal.Rptr.3d 1, 281 P.3d 1000.)

There was a $1 million primary policy in the 1963-1964 policy period. However, it may be disregarded, as it was exhausted under any scenario.

As a result (although Community did not specifically mention this), the premium per dollar of coverage for a primary policy is generally much higher than for an excess policy. (American Safety Indemnity Company v. Admiral Insurance Company (2013) 220 Cal.App.4th 1, 11, 162 Cal.Rptr.3d 699.)

Montrose Chemical Corp. v. Superior Court (2017) 14 Cal.App.5th 1306, 222 Cal.Rptr.3d 748 held that the insured in that case was not entitled to summary adjudication that vertical exhaustion applied. It was decided so recently that it is not yet final (Cal. Rules of Court, rule 8.264(b)(1) ); therefore, we do not discuss it in detail. We note, however, that Montrose is distinguishable from our case on multiple grounds, including that all of the policies here have (1) mutually conflicting other insurance clauses (cf. id. at p. 1334, fn. 7, 222 Cal.Rptr.3d 748, 2017 WL 3772568 at p. *16, fn. 7 ) , and (2) an at least partly self-insured retention (cf. I d. at pp. 1327-1329, 1331, fn. 6, 222 Cal.Rptr.3d 748, 2017 WL 3772568 at pp. *11-*12, *13-*14, fn. 6 ). If and to the extent that the court's reasoning is irreconcilable with ours, we disagree with it for the reasons we have already stated.

See footnote *, ante.

See footnote *, ante.

In addition to St. Paul, Continental also cites Wisper Corp. v. California Commerce Bank (1996) 49 Cal.App.4th 948, 57 Cal.Rptr.2d 141. Wisper is not an insurance case; however, it held that prejudgment interest was not available because comparative fault as between the plaintiffs and the defendant had been "hotly disputed" and thus "[t]he amount of damage could not be determined until after trial." (Id. at p. 962, 57 Cal.Rptr.2d 141.) From the court's references to the "factual environment" of the comparative negligence claim and to the jury as the trier of fact" (ibid. ), it seems clear that the court viewed comparative negligence as an issue of fact, not an issue of law, under the circumstances before it. Thus, it is consistent with our reading of the insurance cases.

Indeed, Continental asserts that some of these issues remained open, and thus precluded certainty, until this court's opinion in 2009 or the Supreme Court's opinion in 2012. Presumably, in Continental's view, even though we are affirming the trial court's vertical exhaustion ruling (see part III, ante ), damages are still uncertain and will remain uncertain until the Supreme Court affirms, reverses, or denies review.

See footnote *, ante.