# IN THE SUPREME COURT OF CALIFORNIA

MONTROSE CHEMICAL CORPORATION
OF CALIFORNIA,

Petitioner,

v.

THE SUPERIOR COURT OF LOS ANGELES COUNTY,

Respondent;

CANADIAN UNIVERSAL INSURANCE
COMPANY, INC., et al.,

Real Parties in Interest.

S244737

Second Appellate District, Division Three
B272387

Los Angeles County Superior Court
BC005158

April 6, 2020

Justice Kruger authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Liu, Cuéllar, Groban, Elia,[*] and Brown[**] concurred.

---

[*] Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[**] Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

MONTROSE CHEMICAL CORPORATION OF CALIFORNIA
v. SUPERIOR COURT

S244737


Opinion of the Court by Kruger, J.


Montrose Chemical Corporation (Montrose) was sued for causing continuous environmental damage in the Los Angeles area between 1947 and 1982 and subsequently entered into partial consent decrees to resolve various claims. Montrose now seeks to tap its liability insurance to cover amounts it owes in connection with those claims. For each policy year from 1961 to 1985, Montrose had secured primary insurance and multiple layers of excess insurance. This case concerns the sequence in which Montrose may access the excess insurance policies covering this period.

Montrose argues it is entitled to coverage under any relevant policy once it has exhausted directly underlying excess policies for the same policy period. The insurers, by contrast, argue that Montrose may call on an excess policy only after it has exhausted every lower level excess policy covering the relevant years. Reading the insurance policy language in light of background principles of insurance law, and considering the reasonable expectations of the parties, we agree with Montrose: It is entitled to access otherwise available coverage under any excess policy once it has exhausted directly underlying excess policies for the same policy period. An insurer called on to provide indemnification may, however, seek reimbursement from other insurers that would have been liable to provide

1

coverage under excess policies issued for any period in which the injury occurred.

# I.

We have previously recounted the basic facts underlying this dispute. (See *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 292–294.) To summarize, Montrose manufactured the insecticide dichloro-diphenyl-trichloroethane (DDT) at its facility in Torrance from 1947 to 1982. In 1990, the United States and the State of California sued Montrose for environmental contamination allegedly caused by Montrose's operation of this facility. Montrose entered into partial consent decrees in which it agreed to pay for environmental cleanup. To meet its obligations, Montrose has now expended millions of dollars—Montrose represents the total is more than $100 million—and asserts that its anticipated future liability could approach or exceed this amount.

Montrose purchased primary and excess comprehensive general liability insurance to cover its operations at the Torrance facility from defendant insurers between 1961 and 1985. Primary insurance refers to the first layer of coverage, whereby "liability attaches *immediately* upon the happening of the occurrence that gives rise to liability." (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597.) Excess insurance, by contrast, "refers to indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim." (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 416, fn. 4.) An excess insurer's coverage obligation begins once a certain level of loss or liability is reached; that level is generally referred to as the "attachment point" of the excess policy. (Rest., Liability

Insurance, § 39, com. d, p. 338.)  Here, 40 insurers collectively issued more than 115 excess policies during the 1961 to 1985 period, which collectively provide coverage sufficient to indemnify Montrose's anticipated total liability.

Montrose and the insurers, which are the real parties in interest here,[1] agree for purposes of this dispute that Montrose's

---

[1]    The real party insurers are:  Continental Casualty Company and Columbia Casualty Company, joined by AIU Insurance Company; Allstate Insurance Company (solely as successor in interest to Northbrook Excess and Surplus Insurance Company); American Centennial Insurance Company; American Home Assurance Company; Federal Insurance Company; Employers Insurance of Wausau; Everest Reinsurance Company (as successor in interest to Prudential Reinsurance Company); Fireman's Fund Insurance Company; General Reinsurance Corporation; Granite State Insurance Company; Lamorak Insurance Company (formerly known as OneBeacon America Insurance Company, as successor in interest to Employers Commercial Union Insurance Company of America, The Employers Liability Assurance Corporation, Ltd., and Employers Surplus Lines Insurance Company); Employers Mutual Casualty Company; Landmark Insurance Company; Lexington Insurance Company; Mt. McKinley Insurance Company (as successor in interest to Gibraltar Casualty Company); Munich Reinsurance America, Inc. (formerly known as American Re-Insurance Company); National Surety Corporation; National Union Fire Insurance Company of Pittsburgh, PA; New Hampshire Insurance Company; North Star Reinsurance Corporation; Providence Washington Insurance Company (as successor by way of merger to Seaton Insurance Company, formerly known as Unigard Security Insurance Company, formerly known as Unigard Mutual Insurance Company); Transport Insurance Company (as successor in interest to Transport Indemnity Company); Westport Insurance Corporation (formerly known as Puritan Insurance Company, formerly known as The Manhattan Fire

primary coverage has been exhausted. Further, the parties have stipulated to the relevant language found in the excess policies.[2] Specifically, each policy provides that Montrose must exhaust the limits of its underlying insurance coverage before there will be coverage under the policy. The policies describe the applicable underlying coverage in four main ways:

1. Some policies contain a schedule of underlying insurance listing all of the underlying policies in the same policy period by insurer name, policy number, and dollar amount.

2. Some policies reference a specific dollar amount of underlying insurance in the same policy period and a schedule of underlying insurance on file with the insurer.

3. Some policies reference a specific dollar amount of underlying insurance in the same policy period and identify one or more of the underlying insurers.

4. Some policies reference a specific dollar amount of underlying insurance that corresponds with the combined limits of the underlying policies in that policy period.

---

and Marine Insurance Company); Zurich International (Bermuda), Ltd.

Insurers Travelers Casualty and Surety Company (formerly known as Aetna Casualty and Surety Company) and The Travelers Indemnity Company opposed Montrose on independent grounds and filed a separate answering brief.

[2] The record does not contain complete copies of every policy between Montrose and the insurers. Instead, the parties have identified the terms of these policies that they believe are sufficient to resolve this dispute. The parties agree the various policies use different language that all communicates the same exhaustion requirement in different ways.

In a variety of ways, the excess policies also provide that "other insurance" must be exhausted before the excess policy can be accessed. Relevant examples include the following:

- Some policies provide that they will "indemnify the insured for the amount of loss which is in excess of the applicable limits of liability of the [scheduled] underlying insurance," and then define "loss" as "the sums paid as damages in settlement of a claim or in satisfaction of a judgment for which the insured is legally liable, after making deductions for all recoveries, salvages and *other insurances (whether recoverable or not) other than the underlying insurance and excess insurance purchased specifically to be in excess of this policy*." (Italics added.)

- Some policies state that the insurer is liable for "the ultimate net loss in excess of the retained limit" and define "retained limit" to mean, among other things, the "total of the applicable limits of the underlying policies listed in [a schedule] [and] the applicable limits of *any other underlying insurance collectible by the insured*." (Italics added.)

- Under a "Loss Payable" provision, one policy provides it will pay "any ultimate net loss," which is separately defined as "the sums paid in settlement of losses for which the Insured is liable after making deductions for all recoveries, salvages and *other insurance (other than recoveries under the underlying insurance, policies of co-insurance, or policies specifically in excess hereof)*." (Italics added.)

- Under a "Limits" provision, some policies provide that "the insurance afforded under this policy shall apply only after

*all underlying insurance* has been exhausted." (Italics added.)

- One policy states that "[i]f *other valid and collectible insurance* with any other insurer is available to the Insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance." (Italics added.)

Montrose and the insurers disagree whether these clauses—which we will collectively call "other insurance" clauses—require Montrose to exhaust other insurance coverage from other policy periods. This dispute dates to 1990, when Montrose first sued its insurers to resolve various coverage disputes, but the relevant filing for our purposes occurred in 2015, when Montrose's fifth amended complaint asserted a new cause of action seeking the following declaration:

"a. In order to seek indemnification under the Defendant Insurers' excess policies, Montrose need only establish that its liabilities are sufficient to exhaust the underlying policy(ies) in *the same policy period*, and is not required to establish that all policies insuring Montrose in *every* policy period (including policies issued to cover different time periods both before and after the policy period insured by the targeted policy) with limits of liability less than the attachment point of the targeted policy, have been exhausted; and

"b. Montrose may select the manner in which [to] allocate its liabilities across the policy(ies) covering such losses."

The rule Montrose proposes in its amended complaint is a rule of "vertical exhaustion" or "elective stacking," whereby it may access any excess policy once it has exhausted other policies with lower attachment points in the same policy period. The insurers, in contrast, each of which has issued an excess policy to Montrose in one of the triggered policy years, argue for a rule of "horizontal exhaustion," whereby Montrose may access an excess policy only after it has exhausted other policies with lower attachment points from *every* policy period in which the environmental damage resulting in liability occurred. The parties filed cross-motions for summary adjudication of this issue.[3]

The trial court denied Montrose's motion and granted the insurers' motion, holding that the excess policies required horizontal exhaustion in the context of this multiyear injury. The court concluded there is a " 'well-established rule that horizontal exhaustion should apply in the absence of policy language specifically describing and limiting the underlying insurance.' " Montrose filed a petition for a writ of mandate,

---

[3]     One set of insurers, Travelers Casualty and Surety Company and The Travelers Indemnity Company (collectively, Travelers), opposed Montrose's motion for summary adjudication for two independent reasons. First, Travelers argued that Montrose's requested declaration would entitle Montrose to indemnification without actually exhausting the relevant underlying insurance, as required by the terms of the Travelers policies. Travelers further argued that California law did not apply to their policies. Because the Court of Appeal concluded for other reasons that Montrose was not entitled to summary adjudication, it did not address the issues raised by Travelers. We did not grant review of either question, as discussed at part II.D., *post*.

which the Court of Appeal summarily denied. We granted Montrose's petition for review and transferred the case to the Court of Appeal with instructions to issue an order to show cause why the relief Montrose sought should not be granted.

The Court of Appeal affirmed the trial court's denial of Montrose's motion for summary adjudication and affirmed in part the trial court's grant of the insurers' parallel motion. (*Montrose Chemical Corp. v. Superior Court* (2017) 14 Cal.App.5th 1306, 1321, 1338 (*Montrose II*).) The court concluded that the plain language of many of the excess policies purchased by Montrose provide that they "attach not upon exhaustion of lower layer policies within the same policy period, but rather upon exhaustion of *all* available insurance." (*Id.* at p. 1327.)

Shortly after the Court of Appeal published its opinion in this case, another Court of Appeal disagreed with its reasoning in *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017. The court in that case determined that vertical exhaustion was appropriate given the relevant policy language and our case law. (*Id.* at pp. 1031–1037.)

We granted review in this case to determine whether vertical exhaustion or horizontal exhaustion is required when continuous injury occurs over the course of multiple policy periods for which an insured purchased multiple layers of excess insurance. Reading the relevant policy language in light of background principles of insurance law and considering the parties' reasonable expectations, we conclude that a rule of vertical exhaustion is appropriate. Under that rule, the insured has access to any excess policy once it has exhausted other directly underlying excess policies with lower attachment

points, but an insurer called upon to indemnify the insured's loss may seek reimbursement from other insurers that issued policies covering relevant policy periods.[4]

## II.

## A.

We begin our analysis with a few background insurance law principles specific to the continuous or "long-tail" injury at issue here, where damage occurs over multiple policy periods. (See *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 195–196 (*Continental*).)  In a much earlier iteration of this case, we noted "the settled rule" is that "an insurer on the risk when continuous or progressively deteriorating damage or injury first manifests itself remains obligated to indemnify the insured for the *entirety* of the ensuing damage or injury," up to the policy's limit.  (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 686, italics added (*Montrose I*).)  "There is no requirement that . . . the conditions giving rise to the damage or injury . . . themselves occur within the policy period in order for potential liability coverage to arise."  (*Ibid.*)  Extending this logic to the continuous injury context, we held that "bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods."  (*Id.* at p. 689.)  This principle is also known as the "continuous injury trigger of coverage."  (*Ibid.*)

---

[4]  Because the question is not presented here, we do not decide when or whether an insured may access excess policies before all primary insurance covering all relevant policy periods has been exhausted.

In *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 57 (*Aerojet*), we illustrated the principle with an example: If an insured company discharges a hazardous substance that causes property damage in the amount of $100,000 each year for a span of 30 years, a $1 million insurance policy that is purchased for the first year of that 30-year span would be required to pay the insured the full $1 million limit for indemnification. Even though the damage traceable to the policy year in which the insurance policy was in effect only amounted to $100,000, the insurer is liable for all damages. As we explained, the insurer's obligation to pay is "triggered if specified harm is caused by an included occurrence, so long as at least some such harm results within the policy period." (*Id.* at p. 56, fn. omitted, citing *Montrose I, supra,* 10 Cal.4th at pp. 669–673.) "It extends to all specified harm caused by an included occurrence, even if some such harm results beyond the policy period." (*Aerojet*, at pp. 56–57.)

This "all sums" rule, as we described it in *Aerojet*, means that "insurers [a]re responsible for defending the insured for all claims that involved the triggering damage" in a continuous injury case; "as long as the policyholder is insured at some point during the continuing damage period, the insurers' indemnity obligations persist until the loss is complete, or terminates." (*Continental, supra,* 55 Cal.4th at p. 197, citing *Aerojet, supra,* 17 Cal.4th at p. 71; *Continental*, at p. 200 [under all sums allocation, insurers must "pay all sums for property damage attributable to the [polluted] site, up to their policy limits, if applicable, as long as some of the continuous property damage occurred while each policy was 'on the loss' "].) We adopted this rule because, contrary to *Aerojet*'s stylized example, "[i]t is often

'virtually impossible' for an insured to prove what specific damage occurred during each of the multiple consecutive policy periods in a progressive property damage case." (*Id.* at p. 196.) "If such evidence were required, an insured who had procured insurance coverage for each year during which a long-tail injury occurred likely would be unable to recover." (*Ibid.*) The all sums approach, we explained, "best reflects the insurers' indemnity obligations under the respective policies, the insured's expectations, and the true character of the damages that flow from a long-tail injury." (*Id.* at p. 200.)

Finally, recognizing that the limits of any one policy may be insufficient to cover the entire liability resulting from a continuous injury, we concluded in *Continental* that the insured may seek indemnification from every policy that covered a portion of the loss, up to the full limits of each policy. (*Continental*, *supra*, 55 Cal.4th at p. 200.) This "all-sums-with-stacking indemnity principle," we said, "properly incorporates the *Montrose* [*I*] continuous injury trigger of coverage rule and the *Aerojet* all sums rule, and 'effectively stacks the insurance coverage from different policy periods to form one giant "uber-policy" with a coverage limit equal to the sum of all purchased insurance policies.' " (*Id.* at p. 201.) " '[T]his approach treats all the triggered insurance as though it were purchased in one policy period' " and recognizes "the uniquely progressive nature of long-tail injuries that cause progressive damage throughout *multiple* policy periods." (*Ibid.*) Importantly, "the insured has immediate access to the insurance it purchased." (*Ibid.*) The insurers can then sort out their proportional share through actions for equitable contribution or subrogation. (*Id.* at p. 200;

11

see *Continental Cas. Co. v. Zurich Ins. Co.* (1961) 57 Cal.2d 27, 37.)[5]

Having adopted an all-sums-with-stacking approach to the coverage of long-tail injuries, we are now presented with a follow-on question: In what order may an insured access excess policies from different policy periods to cover liability arising from long-tail injuries? To illustrate the parties' competing approaches, consider a hypothetical company that caused property damage over three years that resulted in $90 million of damage. Further imagine that in each of these three years, the company had purchased primary insurance with a $10 million limit and two layers of excess insurance, each providing an additional $10 million of coverage:

---

[5]  In a contribution action, an insurer that paid more than its share in the initial coverage action can seek reimbursement from other insurers that were obligated to indemnify or defend the same loss or claim. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293.) The doctrine of equitable subrogation allows an insurer to stand in the shoes of the insured and recover from third parties that are liable to the insured for a loss that the insurer both insured and paid. (*Id.* at pp. 1291–1292.) As a general matter, these types of actions allow insurers to apportion liability for losses among themselves after the insured has been indemnified.

|              | Year 1             | Year 2             | Year 3             |
|--------------|--------------------|--------------------|--------------------|
| $50 million  |                    |                    |                    |
| $40 million  |                    |                    |                    |
| $30 million  | Policy 2A          | Policy 2B          | Policy 2C          |
| $20 million  | Policy 1A          | Policy 1B          | Policy 1C          |
| $10 million  | Primary Insurance  | Primary Insurance  | Primary Insurance  |

We are tasked with deciding between two proposed methods by which these six excess insurance policies might be stacked after the primary insurance has been exhausted to cover the $90 million liability in a way that " 'treats all the triggered insurance as though it were purchased in one policy period.' " (*Continental, supra,* 55 Cal.4th at p. 201.) Under the insurers' proposed rule of horizontal exhaustion, the insured would have to exhaust all of its lower layer excess coverage across all relevant policy periods before accessing any of its higher layer coverage:

| | |
|---|---|
| $90 million | Policy 2C |
| $80 million | Policy 2B |
| $70 million | Policy 2A |
| $60 million | Policy 1C |
| $50 million | Policy 1B |
| $40 million | Policy 1A |
| $30 million | Primary Insurance |
| $20 million | Primary Insurance |
| $10 million | Primary Insurance |

Under Montrose's proposed rule of vertical exhaustion, in contrast, an insured would be permitted to access any higher layer excess policy once it has exhausted the directly underlying excess policy covering the same period:

| $90 million | Policy 2C |
|---|---|
| $80 million | Policy 1C |
| $70 million | Policy 2B |
| $60 million | Policy 1B |
| $50 million | Policy 2A |
| $40 million | Policy 1A |
| $30 million | Primary Insurance |
| $20 million | Primary Insurance |
| $10 million | Primary Insurance |

Which approach applies depends on the terms of the parties' agreement. We therefore begin by looking, as we must, to the language of the insurance policies at issue. (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 (*Minkler*); *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822–823.)

**B.**

"The principles governing the interpretation of insurance policies in California are well settled. 'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect " 'the

objectively reasonable expectations of the insured.' " ' " (*Minkler*, *supra*, 49 Cal.4th at p. 321.) If these rules do not resolve an ambiguity, we may then " 'resort to the rule that ambiguities are to be resolved against the insurer.' " (*Ibid.*)

The parties' dispute centers on the meaning of the "other insurance" clauses in the excess insurance policies. These clauses provide, in a variety of ways, that each policy shall be excess to other insurance available to the insured, whether or not the other insurance is specifically listed in the policy's schedule of underlying insurance. The insurers argue that these clauses call for a rule of horizonal exhaustion because they restrict indemnification from any excess policy until the insured has exhausted all other available insurance—which, in a case of long-tail injury, means every policy with a lower attachment point from every policy period triggered by the continuous injury.

Although the insurers' interpretation is not an unreasonable one, it is not the only possible interpretation of the policy language.[6] The "other insurance" clauses at issue clearly

---

[6] Nor, contrary to the insurers' suggestion, has this interpretation already been adopted in California cases. The insurers invoke various cases interpreting "other insurance" clauses in other settings, but none addresses the question here: whether "other insurance" clauses require horizontal exhaustion of excess insurance policies in cases involving long-tail injury. (See, e.g., *Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 689–690 [addressing defense obligations of a policy providing both excess and "umbrella" defense coverage]; *Peerless Cas. Co. v. Continental Cas. Co.* (1956) 144 Cal.App.2d 617, 625–626 [excess insurer not required to contribute when insurance settlement was prorated across

require exhaustion of underlying insurance, but none clearly or explicitly states that Montrose must exhaust insurance with lower attachment points *purchased for different policy periods*. Policies that disclaim coverage for amounts covered by "other underlying insurance," or require exhaustion of "all underlying insurance," for example, could fairly be read to refer only to other *directly* underlying insurance in the same policy period that was not specifically identified in the schedule of underlying insurance, anticipating that the scheduled underlying insurance may later be replaced or supplemented with different policies.

Other formulations require deductions for, in the words of one set of representative policies, all "other insurances (whether recoverable or not) other than the underlying insurance and *excess insurance purchased specifically to be in excess of this policy*." (Italics added.) If this language were read to apply to insurance purchased for other policy periods, it could fairly be understood to require the exhaustion of *every* other insurance policy at *every* attachment point—not merely, as the insurers' theory of horizontal exhaustion would have it, excess policies from other policy periods that contain lower attachment points. The insurers do not advance this expansive reading, however; they contend that the reference to "other insurance," properly understood, means "other *underlying* insurance"—that is, only excess insurance with lower attachment points from all relevant policy periods. The insurers do not explain why the reference is not properly understood to mean "other *directly underlying*

two primary insurers and at least one primary policy remained unexhausted].)

insurance"—that is, a requirement that the insured exhaust only excess insurance with lower attachment points from the *same* policy period. This is one clue that the plain language of these clauses is not adequate to resolve the dispute in the insurers' favor.

Consideration of the traditional use of "other insurance" clauses reinforces our doubts about the insurers' interpretation. As we have previously explained, " '[h]istorically, "other insurance" clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a particular loss.' " (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1079 (*Dart*).) They have not generally been understood as dictating a particular exhaustion rule for policyholders seeking to access successive excess insurance policies in cases of long-tail injury.

In *Dart*, we considered the meaning of an "other insurance" clause in a different context. There, the policyholder had acquired successive primary policies covering multiple decades and subsequently sought defense and indemnity from one of its primary insurers for a continuous injury during that time even though the policy provided by that insurer had been lost or destroyed. (*Dart, supra*, 28 Cal.4th at pp. 1064–1065.) The policyholder was able to prove the material terms of the policy, but the insurer argued that its contractual obligations may have been relieved or reduced by an "other insurance" clause in the lost policy, pointing to the other policies purchased for the period during which the injury occurred. (*Id.* at p. 1078.) We rejected this argument, explaining that reliance on an "other insurance" clause could not be used to "defeat the insurer's obligations altogether." (*Id.* at p. 1079.) In other words, the

18

insurer in *Dart* could not simply invoke the possibility of an "other insurance" clause to escape its coverage obligations. We reasoned, in a passage the parties have focused on here: " '[A]pportionment among multiple insurers must be distinguished from apportionment between an insurer and its insured. When multiple policies are triggered on a single claim, the insurers' liability is apportioned pursuant to the "other insurance" clauses of the policies [citation] or under the equitable doctrine of contribution [citations]. That apportionment, however, has no bearing upon the insurers' obligations to the policyholder. . . . The insurers' contractual obligation to the policyholder is to cover the full extent of the policyholder's liability (up to the policy limits).' " (*Id.* at p. 1080, quoting *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 105–106.)

The parties dispute whether *Dart* meant to set out a categorical view of the meaning of "other insurance" clauses in cases of continuous injury and whether that view forecloses the insurers' proposed interpretation of the "other insurance" clauses in the distinct context we confront here. Citing *Dart*, Montrose asserts that the "other insurance" clauses are relevant to contribution actions between insurers but not to coverage actions between insurers and policyholders. (See *State of California v. Continental Ins. Co., supra*, 15 Cal.App.5th at p. 1032.) We need not rely on any such categorical rule in this case, however; it is enough to observe that *Dart* undermines the insurers' claim that the "other insurance" clauses *clearly and explicitly* call for a rule of horizontal exhaustion.

In rejecting the insurer's claim in *Dart*, we emphasized that "other insurance" clauses have not traditionally been used

to address questions concerning the obligation of successive insurers to indemnify policyholders for a continuously manifesting injury (a question which, as *Dart* reminds us, "is a separate issue from the obligations of the insurers to each other" (*Dart*, *supra*, 28 Cal.4th at p. 1080)).  (*Id.* at p. 1078, fn. 6.) Elaborating on the same point, the Restatement explains that "other insurance" clauses have generally been used to address "[a]llocation questions with respect to overlapping *concurrent policies*." (Rest., Liability Insurance, *supra*, § 40, com. c, p. 345, italics added.)  Consistent with this understanding, most courts to address the issue have found that "other insurance" clauses are not aimed at governing the proper allocation of liability among successive insurers in cases of long-tail injury or the appropriate sequence in which a policyholder may access its insurance across several policy periods.  (*Id.*, § 41, com. j, p. 361; see *In re Viking Pump, Inc.* (2016) 27 N.Y.3d 244, 266 [52 N.E.3d 1144, 1157] [holding that "other insurance" clauses do not mandate horizontal exhaustion under all sums allocation, and explaining that " 'other insurance' clauses 'apply when two or more policies provide coverage during the *same* period, and they serve to prevent multiple recoveries from such policies' . . . . [O]ther insurance clauses are not implicated in situations involving successive—as opposed to concurrent—insurance policies"]; see also *Steadfast Insurance Co. v. Greenwich Ins.* (2019) 385 Wis.2d 213, 228 [922 N.W.2d 71, 79] [" 'The accepted meaning of "other insurance" provisions does not include application to successive insurance policies.' "]; *Ohio Cas. Ins. Co. v. Unigard Ins. Co.* (Utah 2012) 268 P.3d 180, 184 [" '[O]ther insurance' provisions do not apply to successive insurers."]; *Boston Gas Co. v. Century Indem. Co.* (2009) 454 Mass. 337, 361

[910 N.E.2d 290, 308] [" '[O]ther insurance' clauses simply reflect a recognition of the many situations in which concurrent, not successive, coverage would exist for the same loss."]; *Benjamin Moore & Co. v. Aetna Cas.* (N.J. 2004) 843 A.2d 1094, 1101 [" '[O]ther insurance' clauses, which are provisions typically designed to preclude a double recovery when multiple, concurrent policies provide coverage for a loss[,] . . . [are] not generally applicable in the continuous-trigger context where successive rather than concurrent policies [are] at issue."].) Given the generally understood purpose of "other insurance" clauses, it is difficult to read the clauses here as a clear and explicit direction to adopt a requirement of horizontal exhaustion in cases of long-tail injury.

While the "other insurance" clauses do not speak clearly to the question before us, other aspects of the insurance policies strongly suggest that the exhaustion requirements were meant to apply to directly underlying insurance and not to insurance purchased for other policy periods. First and most obviously, the excess policies explicitly state their attachment point, generally by referencing a specific dollar amount of underlying insurance in the same policy period that must be exhausted. For example, certain Fireman's Fund Insurance Company policies provide: "It is a condition of this policy that the insurance afforded under this policy shall apply only after all underlying insurance has been exhausted." The policies then list the "Underlying Insurance Limit of Liability"—for example, "$30,000,000 each occurrence $30,000,000 aggregate." In other words, this policy agrees to indemnify Montrose once it has exhausted $30 million of underlying insurance. But under the insurers' theory of horizontal exhaustion, Montrose would not

21

be permitted to access this policy until it has exhausted $30 million of underlying insurance *for every relevant policy period*— which would add up to substantially more than $30 million. Indeed, here, where the continuous injury occurred over the course of a quarter century, such a rule would increase the operative attachment point for this policy from $30 million to upwards of $750 million. Thus, where aggregate liability amounts to approximately $200 million, Montrose would not be able to access an insurance policy that, by its terms, kicks in after $30 million of underlying insurance is exhausted.

Relatedly, the excess policies regularly include or reference schedules of underlying insurance—all for the same policy period. Under Montrose's reading, these schedules provide a presumptively complete list of insurance coverage that must be exhausted before the excess policy may be accessed, with the "other insurance" clauses serving as a backstop to prevent double recovery in the rare circumstance where underlying coverage changes after the excess policy is written. (See *Dart*, *supra*, 28 Cal.4th at p. 1079.) But under the insurers' rule of horizontal exhaustion, these schedules would represent only a fraction—perhaps only a small fraction—of the insurance policies that must be exhausted before a given excess policy may be accessed.

In sum, the "other insurance" clauses do not clearly specify whether a rule of horizontal or vertical exhaustion applies here. Read in isolation, the "other insurance" clauses might plausibly be read to perform the function the insurers ascribe to them. But read in conjunction with the actual language of other provisions in the policies, and in light of their historical role of governing allocation between overlapping concurrent policies,

the insurers' reading becomes less likely.  Rather, in the absence of any more persuasive indication that the parties intended otherwise, the policies are most naturally read to mean that Montrose may access its excess insurance whenever it has exhausted the other directly underlying excess insurance policies that were purchased for the same policy period.

## C.

To the extent any of the language of these policies remains ambiguous, we resolve these ambiguities to protect " ' " 'the objectively reasonable expectations of the insured.' " ' " (*Minkler*, *supra*, 49 Cal.4th at p. 321.)  Consideration of the parties' reasonable expectations favors a rule of vertical exhaustion rather than horizontal exhaustion.

For starters, applying the horizontal exhaustion rule would be far from straightforward.  The insurers describe the rule in simple terms:  as a matter of traveling across "layers" of stacked "blocks" of excess insurance coverage before the insured may travel upwards.  But this depiction suggests a degree of standardization across policies that does not exist.  The policies Montrose purchased come in all shapes and sizes, each covering different periods of time, providing different levels of coverage, and setting forth distinct exclusions, terms, and conditions.  Given all of these variations across the relevant dimensions, how would a rule of horizonal exhaustion apply?  If one were to stack the excess policies on a graph based on their coverage limits or attachment points, the first layer of excess insurance in 1984, for example, would appear to reach as high as the 13th layer of excess coverage in 1974.  To which horizontal layer does the 1984 policy belong?  The policies do not say.  Nor does anything in the text of these policies tell us how an "other

insurance" clause in a policy from one period ought to apply to a policy from another period that contains both a lower attachment point and a higher coverage limit. The policies' silence on these basic, foundational questions tends to undermine the idea the parties expected such a rule to apply.

But perhaps more importantly, because the exclusions, terms, and conditions may vary from one policy to another, a rule of horizontal exhaustion would create significant practical obstacles to securing indemnification. As the Court of Appeal stated in *State of California v. Continental Ins. Co.*, *supra*, 15 Cal.App.5th at page 1033, "if a lower-layer insurer for a different policy period happened to claim that some exclusion in its policy applied, a court could not determine whether Continental's policies were triggered without first determining that exclusion claim." Such a rule would put the insured to the considerable expense of establishing a right to coverage under the definitions, terms, conditions, and exclusions from policies in every policy period triggered by the continuous injury. Coverage under less restrictive policies would be delayed until more restrictive policy terms are adjudicated. In sum, "[h]orizontal exhaustion would create as many layers of additional litigation as there are layers of policies." (*Westerport Ins. Corp. v. Appleton Papers Inc.* (Wis.Ct.App. 2010) 787 N.W.2d 894, 918.) What is more, requiring a policyholder to litigate the terms and conditions of all policies with lower attachment points in every policy period before accessing policies with higher attachment points would effectively increase the attachment point—thereby undermining the policyholder's reasonable expectation that coverage would be triggered upon the exhaustion of the amount listed as the policy's stated attachment point. Objectively

speaking, the parties could not have intended to require the insured to surmount all these hurdles before the insured may access the excess insurance it has paid for.

The insurers counter that the rule of horizontal exhaustion is logically compelled by our adoption of an all-sums-with-stacking approach to liability for long-tail injuries. They argue that if the insured is to have access to all policies across all relevant policy periods, it only makes sense that the insured *must* seek indemnification based on its excess coverage across all relevant policy periods; to do otherwise, the insurers assert, would "artificially break[]" the long-tail injury into distinct periods, contrary to our holding in *Continental*. (*Continental*, *supra*, 55 Cal.4th at p. 201.) But the insurers' conclusion does not follow. A rule of vertical exhaustion does not restrict the insured from accessing excess coverage from other policy periods if the terms and conditions are otherwise met; it merely relieves the insured of the obligation of establishing whether *all* of the applicable terms and conditions at any given "layer" of excess coverage are met before it accesses the next "layer" of coverage. There is no evident inconsistency between an all sums approach and one that avoids placing this burden on the insured, with its associated delays, before the insured may access its excess insurance.

But if horizontal exhaustion imposes a heavy burden on the insured, the insurers claim that vertical exhaustion is "totally unfair" to them because "decades' worth of environmental damage [could] fall on the shoulders of disfavored insurers who happened to provide excess insurance . . . during that single unlucky year or two." This argument is not different in kind from arguments we have already

considered and rejected in adopting the all-sums-with-stacking approach to the coverage of long-tail injuries. (See, e.g., *Continental, supra*, 55 Cal.4th at pp. 199–200; *id.* at pp. 201–202.) What we have said in prior cases applies here as well: There is no evident unfairness to insurers when their insureds incur liabilities triggering indemnity coverage under the negotiated policy contract.[7] Just as the all-sums-with-stacking approach allows the insured "immediate access to the insurance it purchased," so, too, does vertical exhaustion in a continuous injury case. (*Continental*, at p. 201.)

Equally to the point, nothing about the rule of vertical exhaustion requires a single insurer to shoulder the burden of indemnification alone. As we explained in the context of primary insurance, "the obligation of successive primary insurers to cover a continuously manifesting injury is a separate issue from the obligations of the insurers to each other." (*Dart, supra*, 28 Cal.4th at p. 1080.) Even though a rule of vertical exhaustion permits Montrose to access excess insurance from any given policy period, provided the directly underlying insurance has been exhausted, insurers may seek contribution from other excess insurers also liable to the insured. The exhaustion rule does not alter the usual rules of equitable contribution between insurers. An insurer required to provide excess coverage for a long-tail injury may lessen its burden by seeking reimbursement from other insurers that issued policies during the relevant period. Once again, the critical difference

---

**7** Whether losses may be partially allocated to the insured for policy periods in which the insured chose to self-insure is a question not presented here.

between a rule of vertical exhaustion and horizontal exhaustion thus is not whether a single disfavored excess insurer will be made to carry a disproportionate burden of indemnification, but instead whether the administrative task of spreading the loss among insurers is one that must be borne by the insurer instead of the insured. There is no obvious unfairness to insurers from a rule that requires them to bear this administrative burden.

The insurers lean heavily on *Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, but that case addresses a meaningfully different scenario and thus offers no real lessons for resolving the question now before us. In *Community Redevelopment*, a primary insurer sought contribution from an excess insurer for defense costs on behalf of the insured in a case involving continuous loss. To resolve the conflict, the court applied what it termed a "horizontal exhaustion rule"; under that rule, the court held, an excess insurer in a continuous injury case is not required "to 'drop down' and provide a defense to a common insured before the liability limits of *all* primary insurers on the risk have been exhausted." (*Id.* at p. 332.) In adopting that rule, the court explained: "Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose* [*I, supra,* 10 Cal.4th 645]. . . . Under the principle of horizontal exhaustion, *all* of the primary policies must exhaust before *any* excess will have coverage exposure." (*Community Redevelopment*, at p. 340.)

This case differs from *Community Redevelopment* in fundamental respects. This case, unlike *Community*

*Redevelopment*, is not a contribution action between primary and excess insurers; it is, rather, a coverage dispute between excess insurers and their insured. Regardless of whether *Community Redevelopment* was correct to apply a rule of horizontal exhaustion in that distinct context—a question not presently before us—we are unpersuaded that the reasoning of *Montrose I* requires us to apply a rule of horizontal exhaustion that would limit Montrose's ability to access the excess insurance coverage it has paid for.

In sum, we conclude that in a case involving continuous injury, where all primary insurance has been exhausted, the policy language at issue here permits the insured to access any excess policy for indemnification during a triggered policy period once the directly underlying excess insurance has been exhausted. Parties to insurance contracts are, of course, free to write their policies differently to establish alternative exhaustion requirements or coverage allocation rules if they so wish. (See *Continental, supra*, 55 Cal.4th at p. 202.)

**D.**

As noted earlier, Travelers opposes Montrose's motion for summary adjudication on two independent grounds. First, Travelers argues that Montrose's requested declaration, which would permit Montrose to "seek indemnification" from an excess policy upon establishing that "its liabilities are *sufficient to exhaust* the underlying policy(ies) in the same policy period," is directly contrary to the terms of the Travelers policies, which require *actual* exhaustion before a policyholder may access excess coverage. Second, Travelers argues that its policies with Montrose must be construed under Connecticut or New York law, rather than California law as assumed by Montrose's

petition, given Montrose's principal place of business at the time the Travelers policies were issued. The lower court did not reach either of these issues because it determined for other reasons that Montrose is not entitled to summary adjudication. (*Montrose II*, *supra,* 14 Cal.App.5th at p. 1336, fn. 9.)

These arguments are not properly before us. We granted Montrose's petition to determine whether Montrose may seek coverage from its excess policies under a rule of vertical exhaustion rather than horizontal exhaustion. The choice between these two rules does not alter any of the remaining prerequisites Montrose must satisfy to obtain indemnification, including actual exhaustion of directly underlying insurance, according to the specific terms of its excess policies. And because the lower courts have not addressed the competing claims about choice of law, we decline to resolve the matter in the first instance. (See *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 348.) Whether California law governs the construction of Montrose's policies with Travelers is a question for the Court of Appeal on remand.

## III.

California law permits Montrose to seek indemnification under any excess policy once Montrose has exhausted the underlying excess policies in the same policy period. Montrose is not required to exhaust excess insurance at lower levels for all periods triggered by continuous injury before obtaining

29

coverage from higher level excess insurance in any period.  We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**
**ELIA, J.**[*]
**BROWN, J.**[**]

---

[*]    Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[**]    Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Montrose Chemical Corp. v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 14 Cal.App.5th 1306
**Rehearing Granted**

_____

**Opinion No.** S244737
**Date Filed:** April 6, 2020
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Elihu Berle

_____

**Counsel:**

Latham & Watkins, Brook B. Roberts, John M. Wilson and Drew T. Gardiner for Petitioner.

Morgan Lewis & Bockius, Michel Y. Horton, Jeffrey S. Raskin, Thomas M. Peterson, Paul A. Zevnik and David S. Cox for ITT LLC and Santa Fe Braun, Inc., as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Julian W. Poon, Jeremy S. Smith and Madeleine F. McKenna for Real Parties in Interest Continental Casualty Company, Columbia Casualty Company, American Centennial Insurance Company and Lamorak Insurance Company.

Sinnott, Puebla, Campagne & Curet, Kenneth H. Sumner and Lindsey A. Morgan for Real Parties in Interest AIU Insurance Company, American Home Assurance Company, Granite State Insurance Company, Landmark Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and New Hampshire Insurance Company.

Sinnott, Puebla, Campagne & Curet, Randolph P. Sinnott, Mary E. Gregory; Cozen O'Conner and John Daly for Real Party in Interest Zurich International (Bermuda) Ltd.

Duane Morris, Max H. Stern and Jessica E. La Londe for Real Party in Interest American Centennial Insurance Company.

Craig & Winkelman and Bruce H. Winkelman for Real Party in Interest Munich Reinsurance America, Inc.

Selman & Breitman, Ilya A. Kosten, Kelsey C. Start; Barbanel & Treuer and Alan H. Barbanel for Real Parties in Interest Transport Insurance Company and Lamorak Insurance Company.

Selman & Breitman and Elizabeth M. Brockman for Real Party in Interest Federal Insurance Company.

Berkes, Crane, Robinson & Seal, Steven M. Crane and Barbara S. Hodous for Real Parties in Interest

Continental Casualty Company and Columbia Casualty Company.

Lewis Brisbois Bisgaard & Smith, Peter L. Garchie and James P. McDonald for Real Party in Interest Employers Mutual Casualty Company.

Barber Law Group and Bryan M. Barber for Real Party in Interest Employers Insurance of Wausau.

McCurdy & Fuller, Kevin G. McCurdy and Vanci Y. Fuller for Real Parties in Interest Everest Reinsurance Company and MT. McKinley Insurance Company.

Chamberlin & Keaster, Chamberlin Keaster & Brockman, Kirk C. Chamberlin, Michael Denlinger and Kevin J. Schettig for Real Party in Interest Providence Washington Insurance Company.

Tressler, Linda Bondi Morrison and Ryan B. Luther for Real Party in Interest Allstate Insurance Company.

Archer Norris, Andrew J. King, GailAnn Y. Stargardter; Tressler and Charles R. Diaz for Real Parties in Interest Fireman's Fund Insurance Company and National Surety Corporation.

Lewis, Brisbois, Bisgaard & Smith, Jordon E. Harriman, Shannon L. Santos; Budd Larner and Michael J. Balch for Real Parties in Interest General Reinsurance Corporation and North Star Reinsurance Corporation.

Hinshaw & Culbertson, Thomas R. Beer and Peter J. Felsenfeld for Real Party in Interest Gerling Konzern Allgemeine Versicherungs-Aktiengesellschaft.

O'Melveny & Myers, Richard B. Goetz, Zoheb P. Noorani and Michael Reynolds for Real Party in Interest TIG Insurance Company.

McCloskey, Waring, Waisman & Drury and Andrew McCloskey for Real Party in Interest Westport Insurance Corporation.

Simpson Thacher & Bartlett, Peter R. Jordon, Andrew T. Frankel, Deborah Lynn Stein and Tyler Z. Bernstein for Real Parties in Interest Travelers Casualty and Surety Company and The Travelers Indemnity Company.

Covington & Burling, David B. Goodwin, Reynold L. Siemens, Jeffrey A. Kiburtz and Heather W. Habes for United Policyholders as Amicus Curiae on behalf of Petitioner.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John Wilson
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
(858) 523-5400

Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7500